**2013-1092, -1095, -1098, -1099, -1101, -1103**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
_____

REALTIME DATA, LLC (doing business as IXO),

*Plaintiff-Appellant,*

*v.*

MORGAN STANLEY, THE GOLDMAN SACHS GROUP, INC.,
J.P. MORGAN CHASE & CO., MORGAN STANLEY & CO., INC.,
GOLDMAN, SACHS & CO., GOLDMAN SACHS EXECUTION &
CLEARING, L.P., J.P. MORGAN SECURITIES, INC.,
and J.P. MORGAN CLEARING CORP.
(formerly known as Bear, Stearns Securities Corp.),

*Defendants-Appellees,*

and

CREDIT SUISSE HOLDINGS (USA), INC. and
CREDIT SUISSE SECURITIES (USA), LLC,

*Defendants-Appellees,*

and

HSBC BANK USA, N.A. and
HSBC SECURITIES (USA), INC.,
*Defendants-Appellees,*

and

BNY CONVERGEX GROUP, LLC and
BNY CONVERGEX EXECUTION SOLUTIONS, LLC,
*Defendants.*

_____

REALTIME DATA, LLC (doing business as IXO),

*Plaintiff-Appellant,*

*v.*

THOMSON REUTERS CORPORATION,

*Defendant-Appellee,*

and

BLOOMBERG, L.P.,

*Defendant-Appellee,*

and

FACTSET RESEARCH SYSTEMS, INC.,

*Defendant-Appellee,*

and

INTERACTIVE DATA CORPORATION,

*Defendant-Appellee.*

_____

REALTIME DATA, LLC (doing business as IXO),

*Plaintiff-Appellant,*

*v.*

THOMSON REUTERS CORPORATION,

*Defendant-Appellee,*

and

BLOOMBERG, L.P.,

*Defendant-Appellee,*

and

FACTSET RESEARCH SYSTEMS, INC.,

*Defendant-Appellee,*

and

INTERACTIVE DATA CORPORATION,

*Defendant-Appellee.*

_____

REALTIME DATA, LLC (doing business as IXO),

*Plaintiff-Appellant*,

*v.*

MORGAN STANLEY, THE GOLDMAN SACHS GROUP, INC.,
J.P. MORGAN CHASE & CO., MORGAN STANLEY & CO., INC.,
GOLDMAN SACHS & CO., GOLDMAN SACHS EXECUTION & CLEARING,
LP, J.P. MORGAN SECURITIES, INC., and J.P. MORGAN CLEARING CORP.
(formerly known as Bear, Stearns Securities Corp.),

*Defendants-Appellees*,

and

CREDIT SUISSE HOLDINGS (USA), INC. and
CREDIT SUISSE SECURITIES (USA), LLC,

*Defendants-Appellees*,

and

HSBC BANK USA, N.A. and
HSBC SECURITIES (USA), INC.,

*Defendants-Appellees*,

and

BNY CONVERGEX GROUP, LLC,
BNY CONVERGEX EXECUTION SOLUTIONS, LLC,
THE BANK OF NEW YORK MELLON CORPORATION,
BANK OF AMERICA CORPORATION,
BANC OF AMERICA SECURITIES, LLC,
MERRILL LYNCH & CO., INC., and
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.,

*Defendants*.

_____

REALTIME DATA, LLC (doing business as IXO),

*Plaintiff-Appellant*,

*v.*

THOMSON REUTERS CORPORATION,

*Defendant-Appellee*,

and

BLOOMBERG, L.P.,

*Defendant-Appellee*,

and

FACTSET RESEARCH SYSTEMS, INC.,

*Defendant-Appellee*,

and

INTERACTIVE DATA CORPORATION,

*Defendant-Appellee*.

_____

REALTIME DATA, LLC (doing business as IXO),

*Plaintiff-Appellant*,

*v.*

MORGAN STANLEY, THE GOLDMAN SACHS GROUP, INC.,
J.P. MORGAN CHASE & CO., MORGAN STANLEY & CO., INC.,
GOLDMAN SACHS & CO., GOLDMAN SACHS EXECUTION & CLEARING,
LP, J.P. MORGAN SECURITIES, INC., and J.P. MORGAN CLEARING CORP.
(formerly known as Bear, Stearns Securities Corp.),

*Defendants-Appellees*,

and

CREDIT SUISSE HOLDINGS (USA), INC. and
CREDIT SUISSE SECURITIES (USA), LLC,

*Defendants-Appellees*,

and

HSBC BANK USA, N.A. and
HSBC SECURITIES (USA), INC.,

*Defendants-Appellees*,

and

BNY CONVERGEX GROUP, LLC,
BNY CONVERGEX EXECUTION SOLUTIONS, LLC,
THE BANK OF NEW YORK MELLON CORPORATION,
BANK OF AMERICA CORPORATION,
BANC OF AMERICA SECURITIES, LLC,
MERRILL LYNCH & CO., INC., and
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.,
*Defendants*.

Appeal from the United States District Court for the Southern District of New
York in Case Nos. 11-cv-6696, 11-cv-6698, 11-cv-6700, 11-cv-6701, 11-cv-6703,
11-cv-6704, Judge Katherine B. Forrest.

**BRIEF FOR DEFENDANTS-APPELLEES MORGAN STANLEY; THE
GOLDMAN SACHS GROUP, INC.; J.P. MORGAN CHASE & CO.;
MORGAN STANLEY & CO., INC.; GOLDMAN, SACHS & CO.;
GOLDMAN SACHS EXECUTION & CLEARING, LP; J.P. MORGAN
SECURITIES, INC.; J.P. MORGAN CLEARING CORP.; CREDIT SUISSE
HOLDINGS (USA), INC.; CREDIT SUISSE SECURITIES (USA) LLC;
HSBC BANK USA, N.A.; HSBC SECURITIES (USA) INC.; BLOOMBERG,
L.P.; FACTSET RESEARCH SYSTEMS INC.; INTERACTIVE DATA
CORPORATION;  AND THOMSON REUTERS CORPORATION**

May 20, 2013

Daniel A. DeVito
Douglas R. Nemec
Stacey L. Cohen
SKADDEN, ARPS, SLATE, MEAGHER & FLOM
    LLP
Four Times Square
New York, NY  10036
(212) 735-3000

James J. Elacqua
Gareth DeWalt

Michael D. Saunders
SKADDEN, ARPS, SLATE, MEAGHER & FLOM
    LLP
525 University Avenue, Suite 1100
Palo Alto, CA  94301
(650) 470-4500

*Attorneys for Defendants-Appellees Morgan
Stanley, The Goldman Sachs Group, Inc.,
J.P. Morgan Chase & Co., Morgan Stanley
& Co., Inc., Goldman, Sachs & Co.,
Goldman Sachs Execution & Clearing, LP,
J.P. Morgan Securities, Inc., and J.P.
Morgan Clearing Corp.*

William F. Lee
Mark G. Matuschak
Monica Grewal
Kevin Prussia
WILMER CUTLER PICKERING HALE AND
    DORR LLP
60 State Street
Boston, MA 02109
(617) 526-5000

Gregory H. Lantier
WILMER CUTLER PICKERING HALE AND
    DORR LLP
1875 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 663-6000

*Attorneys for Defendants-Appellees Credit
Suisse Holdings (USA) Inc. and Credit
Suisse Securities (USA), LLC*

Roy W. Hardin
M. Scott Fuller
LOCKE LORD LLP
2200 Ross Avenue

Suite 2200
Dallas, TX  75201
(214) 740-8601

*Attorneys for Defendants-Appellees*
*HSBC Bank USA, N.A. and*
*HSBC Securities (USA) Inc.*

John M. DiMatteo
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY  10019
Tel: (212) 728-8299

*Attorney for Defendant-Appellee Bloomberg*
*L.P.*

Constance S. Huttner
Stephanie L. Donahue
VINSON & ELKINS LLP
666 Fifth Avenue, 26th Floor
New York, NY  10103
Tel:  (212) 237-0000
Fax: (212) 237-0100

David J. Tobin
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Tel: (214) 220-7700
Fax: (214) 220-7716

Syed K. Fareed
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, Texas 78746-7568
Tel: (512) 542-8400
Fax: (512) 236-3278

*Attorneys for Defendant-Appellee*
*Thomson Reuters Corp.*

Brian E. Moran
Robinson & Cole LLP
1055 Washington Boulevard
Stamford, CT 06901-2249
Tel:  (203) 462-7512
Fax:  (203) 462-7599

*Attorney for Defendant-Appellee*
*FactSet Research Systems Inc.*

Benjamin W. Hattenbach
Arka D. Chatterjee
Irell & Manella LLP
1800 Avenue of the Stars, Ste. 900
Los Angeles, CA  90067-4276
Tel:  (310) 277-1010
Fax: (310) 203-7199

*Attorneys for Defendant-Appellee*
*Interactive Data Corporation*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Morgan Stanley certifies the following:

1.      The full name of every party or amicus represented by me is:

Morgan Stanley

Morgan Stanley & Co. LLC (known, until recently, as Morgan Stanley & Co. Incorporated, which is used for consistency with the district court record)

J.P. Morgan Chase & Co.

J.P. Morgan Securities LLC (known, until recently, as J.P. Morgan Securities, Inc., which is used for consistency with the district court record)

J.P. Morgan Clearing Corp.

The Goldman Sachs Group, Inc.

Goldman, Sachs & Co.

Goldman Sachs Execution & Clearing, L.P.

2.      The name of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me is:

Morgan Stanley

Morgan Stanley & Co. LLC (known, until recently, as Morgan Stanley & Co. Incorporated, which is used for consistency with the district court record)

J.P. Morgan Chase & Co.

J.P. Morgan Securities LLC (known, until recently, as J.P. Morgan Securities, Inc., which is used for consistency with the district court record)

J.P. Morgan Clearing Corp.

The Goldman Sachs Group, Inc.

Goldman, Sachs & Co.

Goldman Sachs Execution & Clearing, L.P.

3.    All parent corporations and any publicly held companies that own ten percent or more of the stock of the party or amicus curiae represented by me are:

Morgan Stanley & Co. LLC is an indirectly wholly-owned subsidiary of Morgan Stanley. No other publicly held corporation owns ten percent (10%) or more of Morgan Stanley & Co. LLC's stock.

Morgan Stanley is a publicly held corporation that has no parent corporation. Mitsubishi UFJ Financial Group, Inc. owns ten percent (10%) or more of Morgan Stanley's stock. No other publicly held corporation owns ten percent (10%) or more of Morgan Stanley's stock.

J.P. Morgan Securities LLC and J.P. Morgan Clearing Corp. are indirectly wholly owned subsidiaries of J.P. Morgan Chase & Co. No other publicly held corporation presently owns ten percent (10%) or more of J.P. Morgan Securities LLC or J.P. Morgan Clearing Corp. stock.

J.P. Morgan Chase & Co. is a publicly held corporation that has no parent corporation. No publicly held corporation presently owns ten percent (10%) or more of J.P. Morgan Chase & Co. stock.

The Goldman Sachs Group, Inc. is a publicly held corporation that has no parent corporation. To The Goldman Sachs Group, Inc.'s knowledge, no publicly held company presently owns ten percent (10%) or more of The Goldman Sachs Group Inc.'s stock.

Goldman, Sachs & Co. is an indirect subsidiary of The Goldman Sachs Group, Inc. To Goldman, Sachs & Co.'s knowledge, no other publicly held company owns ten percent (10%) or more of Goldman, Sachs & Co.

Goldman Sachs Execution & Clearing, L.P. is an indirect subsidiary of The Goldman Sachs Group, Inc. To Goldman Sachs Execution &

Clearing, L.P.'s knowledge, no other publicly held company owns ten percent (10%) or more

Goldman Sachs Execution & Clearing, L.P.

4.    The names of all law firms and the attorneys that appeared for Bloomberg L.P. in the district court or are expected to appear in this Court are:

<u>Skadden, Arps, Slate, Meagher & Flom LLP</u>:

Daniel A. DeVito
James J. Elacqua
Douglas R. Nemec
Stacey L. Cohen
Matthew D. Buchanan
Michael D. Saunders
Gareth DeWalt

Date:  May 20, 2013                          Respectfully submitted,


*/s/ Daniel A. DeVito*

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
Four Times Square
New York, NY  10036
(212) 735-3000

*Counsel for Defendants-Appellees
Morgan Stanley, The Goldman Sachs
Group, Inc., J.P. Morgan Chase & Co.,
Morgan Stanley & Co., Inc., Goldman,
Sachs & Co., Goldman Sachs Execution
& Clearing, LP, J.P. Morgan Securities,
Inc., and J.P. Morgan Clearing Corp.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendant-Appellee Credit Suisse Holdings (USA), Inc. and Credit Suisse Securities (USA), LLC. certifies the following:

1. The full name of every party or amicus represented by me is:

  Credit Suisse Holdings (USA), Inc.; Credit Suisse Securities (USA), LLC

2. The name of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me is:

  The parties named in the caption are the real parties of interest.

3. All parent corporations and any publicly held companies that own ten percent or more of the stock of the party or amicus curiae represented by me are:

  Credit Suisse Securities (USA) LLC is a wholly owned subsidiary of Credit Suisse (USA), Inc., which in turn is a wholly owned subsidiary of Credit Suisse Holdings (USA), Inc. Credit Suisse Holdings (USA) Inc. is jointly owned by Credit Suisse AG and Credit Suisse Group AG.  Credit Suisse AG is wholly owned by Credit Suisse Group AG.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

  <u>Wilmer Cutler Pickering Hale and Dorr LLP</u>

  William F. Lee
  Mark G. Matuschak
  Gregory H. Lantier
  Monica Grewal
  Kevin S. Prussia
  Nicole Feit
  Amy VanHeuverzwyn
  Brian Seeve
  Richard W. O'Neill
  Ross Eric Firsenbaum

Findlay Craft
Eric Hugh Findlay
Roger Brian Craft

Ireland Carroll & Kelley
Otis W Carroll, Jr.
James Patrick Kelley

Skadden, Arps, Slate, Meagher & Flom LLP
Daniel Alexander DeVito

May 20, 2013                    Respectfully submitted,


/s/ Gregory H. Lantier
Gregory H. Lantier
WILMER CUTLER PICKERING HALE AND
DORR, LLP
1875 Pennsylvania Ave NW
Washington, DC 20006
Tel: (202) 247-6327


*Attorney for Defendant-Appellee Credit
Suisse Holdings (USA), Inc.; Credit
Suisse Securities (USA), LLC*

## CERTIFICATE OF INTEREST

Counsel for Petitioner Bloomberg L.P. certifies the following:

1.     The full name of every party or amicus represented by me is:

      Bloomberg L.P.

2.     There are no other real parties of interest represented by me.

3.     Bloomberg L.P. is a limited partnership organized under the laws of the State of Delaware.  Bloomberg, Inc., which is not a publicly held corporation, is Bloomberg L.P.'s general partner and owns 99.5% of its limited partnership interests.

4.     The names of all law firms and the attorneys that appeared for Bloomberg L.P. in the district court or are expected to appear in this Court are:

      Willkie Farr & Gallagher LLP:
          John M. DiMatteo
          Steven H. Reisberg
          Ketan Pastakia (no longer with the firm)
          Robert G. Kofsky

      Capshaw DeRieux, LLP:
          Sidney Calvin Capshaw, III
          Elizabeth L. DeRieux
          Daymon Jeffrey Rambin

Date:  May 20, 2013          Respectfully submitted,


           */s/ John M. DiMatteo*
          John M. DiMatteo
          WILLKIE FARR & GALLAGHER LLP
          787 Seventh Avenue
          New York, New York 10019
          Tel: (212) 728-8299
          jdimatteo@willkie.com

*Attorney for Defendant-Appellee*
*Bloomberg L.P.*

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendant-Appellee Thomson Reuters Corp. certifies the following:

1.     The full name of every party or amicus represented by me is:

Thomson Reuters Corporation

2.     The name of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me is:

Thomson Reuters Corporation

3.     All parent corporations and any publicly held companies that own ten percent or more of the stock of the party or amicus curiae represented by me are:

None

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Vinson & Elkins LLP
        Constance S. Huttner
        Willem G. Schuurman
        Stephanie L. Donahue
        Syed K. Fareed
        David J. Tobin

Ramey & Flock
        Deron R. Dacus

Formerly with Vinson & Elkins LLP
        Michael S. Davi
        Juliet M. Dirba
        Michael V. Rella
        Craig L. Uhrich
        R. Floyd Walker

May 20, 2013                          Respectfully submitted,


                                      */s/ Constance S. Huttner*
                                      Constance S. Huttner
                                      Vinson & Elkins LLP
                                      666 Fifth Avenue, 26th Floor
                                      New York, NY 10103-0040
                                      Tel: (212) 237-0000
                                      Fax: (212) 237-0100
                                      chuttner@velaw.com

                                      *Attorney for Defendant-Appellee*
                                      *Thomson Reuters Corp.*

## **CERTIFICATE OF INTEREST**

Counsel for Defendant-Appellee FactSet Research Systems Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

FactSet Research Systems Inc.

2.     The name of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me is:

FactSet Research Systems Inc.

3.     All parent corporations and any publicly held companies that own ten percent or more of the stock of the party or amicus curiae represented by me are:

None

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Robinson & Cole LLP
Brian E. Moran

May 20, 2013                                    Respectfully submitted,


*/s/  Brian E. Moran*
Brian E. Moran
ROBINSON & COLE LLP
1055 Washington Boulevard
Stamford, CT 06901-2249
Tel:  (203) 462-7512
Fax:  (203) 462-7599
Email:  bmoran@rc.com

*Attorneys for Defendant-Appellee*
*FactSet Research Systems Inc.*

# **CERTIFICATE OF INTEREST**

Counsel for Defendant-Appellee Interactive Data Corporation certifies the following:

1.     The full name of every party or amicus represented by me is:

Interactive Data Corporation.

2.     The name of the real parties in interest (if the party named in the caption is not the real party in interest) represented by me is:

Interactive Data Corporation.

3.     All parent corporations and any publicly held companies that own ten percent or more of the stock of the party or amicus curiae represented by me are:

Igloo Intermediate Corporation is the parent company of Interactive Data Corporation, and holds 100% of the Interactive Data Corporation's common stock. Igloo Intermediate Corporation is 100% owned by Igloo Holdings Corporation. Igloo Holdings Corporation is owned almost entirely by Silver Lake Group and Warburg Pincus through their subsidiaries. No publicly held corporation owns 10% or more of Interactive Data Corporation's stock.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Irell & Manella LLP
    Benjamin W. Hattenbach
    Arka Dev Chatterjee

Formerly of Irell & Manella LLP, will not appear
    Dorian S. Berger
    Mark A. Kressel

Robinson & Cole LLP
    Brian E. Moran

May 20, 2013                                Respectfully submitted,


                                            */s/  Benjamin W. Hattenbach*
                                            Benjamin W. Hattenbach
                                            IRELL & MANELLA LLP
                                            1800 Avenue of the Stars, Suite 900
                                            Los Angelos, CA 90067-4276
                                            Tel:  (310) 277-1010
                                            Fax:  (310) 203-7199
                                            Email:  bhattenbach@irell.com

                                            *Attorneys for Defendant-Appellee*
                                            *Interactive Data Corporation*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................... v

STATEMENT OF RELATED CASES ................................................... 1

STATEMENT OF ISSUES .................................................................... 3

STATEMENT OF THE CASE ............................................................... 4

STATEMENT OF FACTS ..................................................................... 6

I.    PARTIES .................................................................................... 6

    A.    Realtime ......................................................................... 6

    B.    Defendants-Appellees .................................................... 7

II.    THE TECHNOLOGY ................................................................ 8

III.    REALTIME'S ALLEGED INVENTION ....................................... 9

    A.    Content Dependent Data Compression And Content
        Independent Data Compression ..................................... 9

    B.    Data Decompression ..................................................... 13

    C.    Data Compression And Decompression In The Same
        System ........................................................................... 15

IV.    FAST ....................................................................................... 16

    A.    Encoding The Fields In A Message ("Field Encoding") .... 16

    B.    Transfer Encoding ......................................................... 20

    C.    Presence Maps ............................................................... 22

    D.    Decoding A FAST Message ........................................... 22

V.    ASSERTED CLAIMS ................................................................ 23

VI.    Claim Construction and 35 U.S.C. § 112 Briefing ................................25

    A.    The Descriptor Identifies Or Indicates Terms....................................25

    B.    The Encode-Decode Claim Limitation ...............................................26

    C.    The Content Independent And Content Dependent
        Decompression Claims........................................................................27

SUMMARY JUDGMENT ................................................................................28

SUMMARY OF ARGUMENT .........................................................................30

ARGUMENT ................................................................................................31

I.    The District Court Correctly Construed The
    "Descriptor ... Indicates/Identifies" Terms and
    Correctly Applied that Construction to Undisputed
    Facts ...........................................................................................31

    A.    The District Court Correctly Interpreted The "Descriptor
        ... Indicates/Identifies" Clauses To Mean "Recognizable
        Data That Is Appended To The Encoded Data For
        Specifying" ........................................................................................32

    B.    The District Court Correctly Concluded That The
        Defendants-Appellees Do Not Utilize A "Descriptor"
        That "Indicates" Or "Identifies"........................................................37

        1.    Realtime cannot identify any material disputed fact ...............38

        2.    The district court properly applied the claim
            construction to the undisputed facts.......................................40

            a.    The PMAP neither identifies nor indicates
                the selected encoders ......................................................41

            b.    The Template ID (alone or in combination
                with the PMAP) neither identifies nor
                indicates the selected encoders .......................................42

c. The patents' specifications are wholly consistent with the district court's summary judgment ruling ................................................ 43

C. Realtime Put Forth No Relevant Doctrine Of Equivalents Evidence On Descriptor … Indicates/Identifies ................................. 46

II. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE ENCODING-DECODING CLAIMS ......................................................... 47

A. Realtime Cannot Challenge A Stipulated Construction On Appeal ........................................................... 48

B. The Agreed-Upon Construction Is Supported By The Claims And Specification ..................................... 51

1. The plain meaning of the claim language requires encoding and decoding by a single system/method ................ 51

2. The specification supports claims directed to an encoding-decoding system or method ..................... 53

3. Realtime's reliance on *Uniloc* and *SiRF* is misplaced ................................................. 54

C. Realtime Cannot Prove Infringement Of The Encoding Limitation Of The Encoding-Decoding Claims Literally Or Under The Doctrine Of Equivalents ............................. 56

III. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT OF INVALIDITY AS TO CLAIMS 1, 4, 6, 7, AND 12 OF THE '651 PATENT AND CLAIMS 1, 7, 8, AND 13 OF THE '747 PATENT .......................................................... 57

A. The District Court Correctly Invalidated The Claims For Failing The Written Description Requirement .................... 58

B. The Terms "Content Dependent Data Decompression" and "Content Independent Data Decompression" Are Indefinite ................................................. 64

CONCLUSION ................................................................................................67

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Abbott Laboratories v. Syntron Bioresearch, Inc.*, 334 F.3d 1343 (Fed. Cir. 2003) .................................................................................49

*Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) (en banc) ...............................................................60, 61

*Bicon, Inc. v. Straumann Co.*, 441 F.3d 945 (Fed. Cir. 2006)................................53

*BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373 (Fed. Cir. 2007), overruled on other grounds by *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012) ..........53, 56

*Brand Management, Inc. v. Menard, Inc.*, 1998 WL 15241 (Fed Cir. 1998) (unpublished)..........................................................41

*Callicrate v. Wadsworth Manufacturing, Inc.*, 427 F.3d 1361 (Fed. Cir. 2005) .................................................................................49

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......................................................38

*Centillion Data Systems, LLC v. Qwest Communications International, Inc.*, 631 F.3d 1279 (Fed. Cir. 2011).....................................56

*Conoco, Inc. v. Energy & Environmental International, L.C.*, 460 F.3d 1349 (Fed. Cir. 2006)...............................................................48

*Decisioning.com Inc. v. Federated Department Stores, Inc.*, 527 F.3d 1300 (Fed. Cir. 2008)...............................................................51

*Digital-Vending Services International v. University of Phoenix, Inc.*, 672 F.3d 1270 (Fed. Cir. 2012) .......................................48, 49, 50

*Elliot v. Barker*, 481 F.2d 1337 (C.C.P.A. 1973) ...................................................66

*Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310 (Fed. Cir. 2013) .................................................................................32

*General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978 (Fed. Cir. 1997) .................................................................................40

*In re Baycol Products Litigation*, 596 F.3d 884 (8th Cir. 2010) ............................66

*In re Fosamax Products Liability Litigation*, 707 F.3d 189 (2d Cir. 2013) ............................................................................41

*In re Morgan Stanley*, 417 F. App'x 947 (Fed. Cir. 2011).....................................4, 6

*Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.*, 554 F.3d 1010 (Fed. Cir. 2009)............................................................37

*LizardTech Inc. v. Earth Resource Mapping Inc.*, 424 F.3d 1336 (Fed. Cir. 2005)..........................................................50, 51

*Meyer Intellectual Properties Ltd. v. Bodum Inc.*, 690 F.3d 1354 (Fed. Cir. 2012)..............................................................51

*Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008) ...................56

*Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866 (Fed. Cir. 1998).....................................................63

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ...................................32, 52

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999)............................................................53

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299 (Fed. Cir. 2008)............................................................61

*Retractable Technologies, Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296 (Fed. Cir. 2011)........................................37

*SiRF Technology, Inc. v. International Trade Commission*, 601 F.3d 1319 (Fed. Cir. 2010)...................................................54, 55, 56

*Storage Technology Corp. v. Cisco Systems, Inc.*, 329 F.3d 823 (Fed. Cir. 2003)..............................................................53

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870 (Fed. Cir. 2004)..............................................................49

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) .............54, 55

*Union Pacific Resources Co. v. Chesapeake Energy Corp.*, 236 F.3d 684 (Fed. Cir. 2001)........................................................................................61

*Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317 (Fed. Cir. 2009)................52

## STATUTES

28 U.S.C. § 1404(a) ...................................................................................4

35 U.S.C. § 112...............................................................................*passim*

## OTHER AUTHORITIES

Fed. R. Civ. P. 56(e)................................................................................38

David Solomon, Data Compression: The Complete Reference (3d ed. 2004) .........................................................................................62

## STATEMENT OF RELATED CASES

The Bank Defendants-Appellees[1] and Data Provider Defendants-Appellees[2] agree with Plaintiff-Appellant's ("Realtime") Statement of Related Cases.[3]  The Bank and Data Provider Defendants-Appellees join the brief of CME Group, Inc., Board of Trade of the City of Chicago, Inc., The New York Mercantile Exchange, Inc., and Bats Trading, Inc. ("CME Br."), addressing the non-infringement judgment based on the data field/data type limitation and the order precluding doctrine of equivalents theories.  The Bank and Data Provider Defendants-Appellees also join the Response Brief of Defendants-Appellees International Securities Exchange, NYSE Euronext, Options Price Reporting Authority, NYSE ARCA, Inc., NYSE MKT, LLC (formerly known as NYSE

---

[1] The "Bank Defendants-Appellees" are Morgan Stanley; The Goldman Sachs Group, Inc.; J.P. Morgan Chase & Co.; Morgan Stanley & Co., Inc.; Goldman, Sachs & Co.; Goldman Sachs Execution & Clearing, LP; J.P. Morgan Securities, Inc.; J.P. Morgan Clearing Corp.; Credit Suisse Holdings (USA), Inc.; Credit Suisse Securities (USA) LLC; HSBC Bank USA, N.A.; and HSBC Securities (USA) Inc.

[2] The "Data Provider Defendants-Appellees" are Bloomberg, L.P.; FactSet Research Systems Inc.; Interactive Data Corporation; and Thomson Reuters Corporation.

[3] As discussed in their Opposition to Realtime's Motion for Consolidation (2013-1092 Dkt. 29), Defendant-Appellees Credit Suisse Holdings (USA), Inc. and Credit Suisse Securities (USA) LLC maintain that the appeals identified by Realtime do not involve identical issues.

Amex, LLC), and Securities Industry Automation Corporation, addressing the

non-infringement judgments based on the "data stream" terms.

**STATEMENT OF ISSUES**

1.      Whether the district court correctly granted summary judgment of non-infringement as to all claims requiring that the encoded data include one or more "descriptors" that "indicate" or "identify" encoders, where it is undisputed that the accused encoding protocol does not include information with the encoded data that specifies encoders.

2.      Whether the district court correctly granted summary judgment of non-infringement with respect to claims 95, 97, 108, and 112 of U.S. Patent No. 7,777,651 (the "Encoding-Decoding claims") where it applied an agreed-upon claim construction requiring the selection of encoders, and it is undisputed that the accused decompression software does not select any encoders.

3.      Whether the district court correctly granted summary judgment of invalidity of claims 1, 4, 6, 7, and 12 of U.S. Patent No. 7,777,651 and claims 1, 7, 8, and 13 of U.S. Patent No. 7,714,747 ("CDDD/CIDD claims") for failure to comply with 35 U.S.C. § 112 where the written description fails to describe the late-added claim limitations "decompressing the data block … utilizing content dependent data decompression if the descriptor indicates the data block is encoded utilizing content dependent data compression" and "decompressing the data block … utilizing content independent data decompression if the descriptor indicates the data block is encoded utilizing content independent data compression."

3

4.    Whether the district court correctly granted summary judgment of

invalidity of the CDDD/CIDD claims 35 U.S.C. § 112 for indefiniteness, where the

claim terms "content dependent data decompression" and "content independent

data decompression" are insolubly ambiguous.

## STATEMENT OF THE CASE

On July 22, 2009, Realtime filed the first three of nine actions in the Eastern

District of Texas alleging patent infringement against more than forty defendants

in the securities industry, including exchanges, banks, and data providers.

JA4918-4948.  In the nine actions, Realtime asserted six patents: U.S. Patent Nos.

7,714,747 ("the '747 patent"), 7,777,651 ("the '651 patent"), 6,624,761 ("the '761

patent"),  7,161,506 ("the '506 patent"), 7,400,274 ("the '274 patent"), and

7,417,568 ("the '568 patent") against all defendants.  *Id.*

By writ of mandamus, this Court ordered the district court to transfer all of

the cases to the Southern District of New York pursuant to 28 U.S.C. § 1404(a).

*See In re Morgan Stanley*, 417 F. App'x 947, 948 (Fed. Cir. 2011).  Realtime later

abandoned its infringement claims for three of the six patents (the '761, '506, and

'274 patents) after the Patent Office found the asserted claims invalid during

4

reexamination proceedings.  As a result, only the '651, '747, and '568 patents remained in suit (collectively, the "Patents-in-Suit").[4]

On March 26, 2012, the parties filed their opening *Markman* briefs and supporting materials with regard to disputed claim terms.  JA329.  The parties also submitted their agreed-upon constructions of several claim terms.  JA6813-6821.  Defendants filed a motion for partial summary judgment of invalidity for indefiniteness and failure to satisfy the written description requirement of 35 U.S.C. § 112 on April 4, 2012.  JA330.

On May 4, 2012, the district court held a full-day *Markman* hearing that included technology tutorials and testimony from both Realtime's and defendants' experts.  JA331.

The district court issued a *Markman* order on June 25, 2012, construing the disputed claim terms.  JA25-65.  On June 27, 2012, the district court granted defendants' motion for partial summary judgment of invalidity on the grounds that the CDDD/CIDD claims were invalid as indefinite and lacking written description.  JA66-86.  The parties then submitted a joint letter seeking the court's entry of the stipulated claim constructions, JA5334-42, which the court adopted on July 9, 2012, JA1403-1407.

---

[4] Realtime subsequently dropped its infringement allegations for the '568 patent against all Data Provider Defendants-Appellees and all Bank Defendants-Appellees except Morgan Stanley.

On July 17, 2012, the parties filed competing motions for summary judgment. JA334. On September 24, 2012, the district court issued an order granting summary judgment of no infringement on the basis that certain defendants' software does not meet the "descriptor … indicates/identifies,"[5] and "select[s] … encoders"[6] limitations of the asserted claims. JA100-147. The district court applied these ruling to all defendants in a supplemental order dated November 9, 2012. JA161-165.

## STATEMENT OF FACTS

### I.  PARTIES

#### A.  Realtime

Realtime is a "non-practicing entity" headquartered in New York. *See In re Morgan Stanley*, 417 F. App'x 947, 948 (Fed. Cir. 2011). Realtime has never sold a successful product and does not practice any of its patents. *Id.* at 950.

---

[5] Realtime has asserted claims 15, 20, 22, and 32 of the '568 patent; 1, 7, 8, 13, 14, and 19 of the '747 patent; and 1, 4, 6, 7, 12, 13, 18, 19, 21, 22, 25, 26, 29, 34, 35, 43, 47, 49, 95, 97, 108, and 112 of the '651 patent against some or all defendants. All asserted claims except claims 20 and 22 of the '568 patent contain the "descriptor … indicates" limitation.

[6] Claims 95, 97, 108, and 112 of the '651 patent contain this "select[s] … encoders" requirement. In addition, claims 1, 7, 8 and 13 of the '747 patent; and 1, 4, 6, 7 and 12 of the '651, which the district court found invalid for failure to comply with 35 U.S.C. § 112, contain this requirement.

### B.    Defendants-Appellees

Defendants-Appellees are institutions in the securities industry.  Generally, the Exchange Defendants-Appellees[7] transmit "feeds" of market information to their customers: the Bank Defendants-Appellees, the Data Provider Defendants-Appellees, and other Exchange Defendants-Appellees.  *See* JA525(ch. 2, 0:00-17).  A market data feed is a stream of information concerning sales, offers for sales, and requests to purchase financial instruments (such as stocks) on an exchange.  *See* JA1841, JA525(ch. 4, 0:50-1:17).  The process of transmitting these feeds sometimes includes data compression and encoding.[8]  *See*  JA5248 (0:45-3:48, 5:00-6:15).  Where a market feed is encoded, a customer decodes it to access the market information.  *See id.* (6:45-8:26)

---

[7] The "Exchange Defendants-Appellees" are BATS Exchange, Inc.; BATS Trading, Inc.; BOX Options Exchange LLC (sued as Boston Options Exchange Group LLC); CME Group Inc.; Board of Trade of the City of Chicago, Inc.; New York Mercantile Exchange, Inc.; International Securities Exchange; NASDAQ OMX Group, Inc.; NASDAQ OMX PHLX LLC; NYSE MKT, LLC (formerly known as NYSE Amex, LLC); NYSE Arca, Inc.; NYSE Euronext; Securities Industry Automation Corporation; and Options Price Reporting Authority.

[8] With one exception, none of the Bank or Data Provider Defendants-Appellees encode or compress market data using the accused protocol.  Specifically, in addition to receiving and decompressing market data already compressed by exchanges (like all other Bank and Data Provider Defendants-Appellees), Bank Defendant-Appellee Morgan Stanley compresses certain data for internal transmission and subsequent decompression.

## II.    THE TECHNOLOGY

The Patents-in-Suit generally relate to the compression, decompression, encoding, and decoding of data. JA480(3:43-47); *see also* JA514-515(14:35-15:36).

In computer systems, where all information is represented using "bits" that are 1s and 0s, data "compression" refers to the process of modifying a set of data so that it is represented with fewer bits. JA1406. One way to compress information, for example, is to replace recurring patterns with a unique symbol. JA580(28:19-25). Thus, in "run-length encoding," repeated "runs" of single characters (such as "AAAAAAAA") are identified and replaced with coded instructions (such as "A@8"). *Id*. Another way to compress data is to represent commonly used characters or phrases with compact symbols, while assigning longer symbols to infrequently used characters or phrases. JA512(10:34-43). Morse code is a well-known example of employing this strategy.

Compression can be achieved by application of one or more "encoders," each of which implements a set of steps (sometimes referred to as a "compression algorithm") to compress data by converting the contents of a data block or field into a coded representation of those contents.[9] JA63. Common, well-known

---

[9] The district court correctly construed "encoding" as "compressing by converting the contents of a data block (or data field) into a coded representation of those contents." JA63.

encoders identified in the Patents-in-Suit utilize compression algorithms known as run-length encoding, Huffman coding, Arithmetic coding, and Lempel-Ziv Dictionary Compression.  JA482(7:3-7).

In binary systems, data "decompression" refers to modifying a set of data so that it is represented with more bits than the compressed form.  *See* JA1406.  "Decoding" refers to decompressing by reconstructing encoded data, i.e., recreating the information as it existed prior to being encoded.  JA63.

## III.  REALTIME'S ALLEGED INVENTION

### A.    Content Dependent Data Compression And Content Independent Data Compression

Realtime describes its invention as a method of "data compression using a combination of content independent data compression and content dependent data compression."  JA436(Abstract); *see also* JA514-515(14:35-15:36).  As the district court found, "content *dependent* data compression" ("CDDC") refers to compression using one or more encoders selected based on the encoder's (or encoders') known ability to effectively encode the type of data in that data block.  JA64.[10]  For instance, if Huffman encoding is known to be highly effective at compressing text, and the compression software's analysis reveals that an

---

[10] As the district court correctly found, in the claims, CDDC is applied only to data that is not encoded using "content independent data compression."  JA64.

9

uncompressed data block is text data, an encoder that performs Huffman encoding might be selected based on this knowledge.  *See, e.g.*, JA482(7:3-9).

"Content ***independent*** data compression" ("CIDC") refers to compression applied using one or more encoders without regard to the encoder's (or encoders') known ability to effectively encode the data block type (or data field type).  JA64.[11]  Embodiments that apply CIDC may test several different encoders, compare the results, and select the encoder or encoders that most effectively compress the data block.  *See, e.g.*, JA449(fig. 4); JA483(10:1-29).

The Patents-in-Suit disclose CDDC and CIDC in Figures 13A and 13B and the accompanying text:

---

[11] The district court correctly found that, in the claims, CIDC is applied only to data that is not encoded using CDDC.  JA64.



**FIGURE 13A**

JA461, JA486(15:50-60).

A data compression system as described by the specifications receives a stream of data which is processed in data blocks. JA486(15:60-65). A content dependent data recognition module **1300** analyzes the content of each data block to determine a data block type. JA486(16:12-18). If it recognizes a data type from among a list of data types, it routes the data block to a "content dependent" encoder module **1320**, which encodes the data block using one or more "D" encoders based on its recognized data type. JA486(16:21-36).

11

If the content dependent data recognition module **1300** does ***not*** recognize the data type, then the data block is sent to a "content independent" encoder module **30**, which encodes the data block using one or more "E" encoders by, for example, testing the compression achieved by multiple encoders and choosing the most effective one.  JA486(16:21-24, 40-50).   Notably, the patent states that "D" encoders may be the same encoders as "E" encoders.  *See* JA486(16:27-34, 42-47).  For example, a Huffman encoder may be used as both a "D" encoder and as an "E" encoder.  *Id.*



**FIGURE 13B**

JA462.

12

Following encoding, the encoded data is sent to a compression ratio module **1340**, which calculates the compression achieved, if any.  JA487(17:32-46).  If an encoded data block is sufficiently compressed, then the module **1340** selects it for transmission.  *Id.*

A compression type description module **1350** then "appends a corresponding compression type descriptor to each encoded data block which is selected for output so as to indicate the type of compression format of the encoded data block." JA487(17:55-60).  This compression type descriptor identifies only the selected encoder.  JA487-488(18:63-19:4).  Thus, the descriptor may identify that Huffman coding was used to compress the data, but it would not identify whether it was a "D" encoder or an "E" encoder at the time of selection (i.e., whether the encoder was used as a result of CDDC or CIDC).  *Id.*

### B.     Data Decompression

Data decompression in the patents is accomplished by the use of a decoder (or decoders) corresponding to the encoder(s) used to compress the data. JA486(15:27-31).  Figure 11 illustrates this decompression:

13



FIG. 11

JA459.

As shown, a data decompression system receives a data stream of one or more blocks of data. JA485(14:39-44). A descriptor extraction module **1102** examines each data block "using methods known by the those skilled in the art to extract the data compression type descriptor associated with the data block." JA485(14:49-54). If the data compression type descriptor is "null," the associated data has not been compressed; and the uncompressed data is simply output to block **1106**. JA485-486(14:54-15:26). If the data compression type descriptor is not null, then one or more corresponding decoders are selected from the available set of n decoders in a decoding module **1104**. JA485-486(14:60-15:7, 15:27-31). Decoding module **1104** selects the one or more decoders corresponding to the

14

encoders that the descriptor identifies. *Id.* The "input data block is then decoded using the selected decoders … and output." JA486(15:37-40). The steps are repeated for each data block in the stream. JA486(15:40-49).

### C. Data Compression And Decompression In The Same System

While the above discussion addresses compression and decompression separately, the specification of the '651 patent teaches that Realtime also envisioned a combined "compression/decompression scheme" as part of its invention. JA512(9:55-58) ("Advantageously, a compression/decompression scheme according to the present invention using Huffman or Arithmetic encoding provides secure transmission …"). This embodiment is shown in Figure 2, which "illustrates a system/method for providing accelerated transmission of data according to one embodiment of the present invention" including "a broadcast data server (transmitter) and client system (receiver) for implementing accelerated transmission and real-time processing of broadcast data." JA503(fig. 2); JA512(9:4-10).

Though Realtime now argues that the written description of the '651 patent would not support claims that require both compression and decompression by the same system (*see infra* at § II.B.2), two previously asserted patents which share the '651 patent's written description also include claims directed to an invention with both compression and decompression functionalities. The '568 patent, the parent

15

of the '651 patent, contains 18 such claims.  JA431-432(26:63-28:49).  For example, claim 53 of the '568 patent recites "selecting an encoder," "compressing the data," and "utilizing a descriptor … to decompress the compressed data." JA431-432(26:63-27:8).  Claims 1-10 of the '274 patent also include both compression and decompression steps.  JA6398(23:35-47) (reciting "selecting an encoder," "compressing the data," and "utilizing a decompression state machine … to decompress the compressed data."

## IV.    FAST

Realtime's infringement allegation is based upon Defendants-Appellees' use of the FIX Adapted for STreaming ("FAST") Protocol, a protocol for transmission of financial data in compressed form.  *See* JA526-527.  FAST is a two-step process for reducing the size of transmissions of financial data, including (1) "field encoding" and (2) "transfer encoding."  JA536-538.

### A.    Encoding The Fields In A Message ("Field Encoding")

In FAST, market data is typically transmitted in units known as "messages." *See* JA1811-1812.  A message could indicate, for example, the execution of an order to buy or sell a particular financial instrument (such as shares of stock) or a quote of the current value of a financial instrument.  JA539.

Each message contains several "fields."  JA1812.  A field contains one piece of information relevant to the message, such as the name of a financial instrument,

16

the time of a transaction, or the name of an involved broker.  For example, a message conveying a purchase order for 100 shares of Coca-Cola Company stock would have separate fields indicating (1) the number of shares purchased was 100, (2) Coca-Cola Company ("KO") stock was purchased, and (3) the purchase price was $42.90.  In practice, such a message would also contain numerous additional fields.  *See* JA542.

Field encoding in FAST compresses data by taking advantage of certain characteristics of financial data streams.  First, in a financial data stream, the ordering of the fields within each type of message (*e.g.*, stock quotes) is always the same (*e.g.*, (1) purchased (2) number of shares (3) stock symbol).  *See* JA539; JA5214.  Second, the type of data within a field never changes (*e.g.*, the stock symbol field will always contain text, instead of numerals, etc.).  *Id*.  Third, much of the content of streaming financial data tends to remain the same, or changes only slightly, between data messages.  JA1843.  For example, the "stock symbol" field may not change from one message to the next, in which case it is unnecessary for the second message to retransmit the stock symbol information, and compression can be achieved by omitting it, as long as the receiver knows to populate the field with the prior value.  *See* JA529-530; JA1843.

Field encoding in FAST is accomplished through the use of one or more message "Templates."  JA537; JA539-542.  A Template is a file that, for a

particular category of messages, specifies the fields, the order of the fields, and how (if at all) each field is to be encoded. JA539-540. A Template for purchase orders, for example, could dictate that the first field will contain the number of shares purchased, the second field will contain the relevant stock symbol, and the third field will contain the price (as shown below, actual FAST Templates have a far greater number of fields for each message). *See* JA542.

In addition to specifying the fields and their order for each type of message, FAST Templates also include, for each field, a pre-selected single field "operator" that may be applied to that field. JA540-542; JA1803. These operators can include, for example:

1) "Copy": removes the field if the value of the field is a copy of the value in that same field in the previous message;

2) "Increment": removes the field if the value is one more than the value in that same field in the previous message;

3) "Delta": represents the field value as the difference from the value in that same field in the previous message;

4) "None": the field is not encoded regardless of the value.

JA529; JA540. A representation of a sample Template from the FAST User's Guide appears below:

The following table provides a field-by-field account of the template:

Table 3 – Sample Template Definition

| Template Entry | FIX Field Name | Field Encode Operation | Data Type | Description of Operation |
|---|---|---|---|---|
| 8s!FIX4.4 | BeginString | Default Value | String | Default BeginString to the string value of "FIX4.4" |
| 9u | BodyLength | None | Unsigned integer | Always explicitly specify the value of BodyLength |
| 35s!X | MessageType | Default Value | string | Default MessageType to the string value of "X" |
| 49s= | SenderCompID | Copy Code | String | Copy SenderCompID from the prior occurrence |
| 34u+1 | SequenceNumber | Increment | Unsigned integer | Increment SequenceNumber by +1 from the prior occurrence |
| 268u | NoMDEntries | None | Unsigned integer | Always explicitly specify the value of NoMDEntries |
| 279u= | MDUpdateAction | Copy Code | Unsigned Integer | Copy MDUpdateAction from the prior occurrence |
| 269s= | MDEntryType | CopyCode | String | Copy MDEntryType from the prior occurrence |
| 55s= | Symbol | CopyCode | String | Copy Symbol from the prior occurrence |
| 167s= | SecurityType | CopyCode | String | Copy SecurityType from the prior occurrence |
| 270F- | MDEntryPrice | Delta Value | Scaled Number | Calculate the difference from the prior occurrence of MDEntryPrice |
| 271F- | MDEntrySize | Delta Value | Scaled Number | Calculate the difference from the prior occurrence of MDEntryPrice |
| 346u- | NumberOfOrders | Delta Value | Unsigned integer | Calculate the difference from the prior occurrence of NumberOfOrders |
| 276s= | QuoteCondition | CopyCode | String | Copy QuoteCondition from the prior occurrence |
| 277s= | TradeCondition | CopyCode | String | Copy TradeCondition from the prior occurrence |

JA542.

Field encoding using Templates allows for shorter messages to be transmitted because the sender can often send no information at all for a field (for example, where the Copy or Increment operator is used), or can send abbreviated information for a field (for example, where the Delta operator is used). *See* JA530. Because the decoding system already has the appropriate Template, the encoding

19

system further saves space by not having to transmit information regarding which field encoders were used.  *See* JA539; JA529-30.

Templates are established long before compression is performed and are never transmitted with compressed data.  JA5873; JA5882.  Instead, all Templates are stored by **both** the sender and the receiver of FAST data before any messages are transmitted.  JA5873; JA5882; JA1845 ("FAST[sm] messages cannot 'exist' without some form of pre-session template exchange.").

Because a single data feed may include more than one type of message (*e.g.*, both stock purchase orders and asking price information for stock could be communicated in the same feed), there may be multiple Templates.  In that case, each Template may be assigned a number or other short representation known as a "Template ID."  JA545.  A "Template ID" is included with each compressed message.  *Id.*

## B.    Transfer Encoding

The second step in the FAST Protocol is known as "transfer encoding." Transfer encoding is applied to all data, whether or not it has also been field encoded.  JA529-531.

Transfer encoding is accomplished, in relevant part, through "stop-bit encoding" each field of each message.  JA1812; JA530-531.  Stop-bit encoding exploits the fact that, normally, fewer than all of the bytes available for a field are

used, because the value of the field is not large enough to require them. For example, because numeric values from 0 to 255 can be represented in one 8-bit byte,[12] only if the value of a field exceeds 255 is more than a single byte of data needed to convey that field of a message. However, to allow for larger values, each field normally contains several bytes.

Where fewer than the allotted bytes of a field are used, stop-bit encoding allows for transmission without the unused bytes. To do so, FAST first reorganizes the field data into 7-bit segments. JA1812; JA530-531. FAST then inserts an indicator of the place where each field ends, called a "stop-bit," before or within each 7-bit segment, to create new "stop-bit encoded" bytes. A stop-bit with value "1" indicates that the byte is the last byte in a field. *Id.* A stop-bit with value "0" indicates that it is not the last byte in the current field. *Id.* This allows the encoding system not to send unused bytes of data for that field.



---

[12] This is because each bit in the byte can represent two states, and $2^8$ is 256.

As shown above, the information in the original field can be conveyed in three stop-bit encoded bytes by discarding the unnecessary leading zeroes. Because the decoder knows to expect a four byte field, it can reconstruct the information from the three-byte stop-bit encoded form to obtain its original 4-byte form.

### C.    Presence Maps

"Presence maps" ("PMAPs") are special-purpose bits inserted near the beginning of each FAST-encoded message. JA1812-1814; JA530-531; JA538. The PMAP indicates which fields are present in the encoded message and which fields have been omitted as a result of the field-encoding process.[13] *Id.* The PMAP indicates the presence of field data with a "1," and the absence of field data with a "0." *See* JA1828-1832. The decoder derives data for the missing fields from a previous message it received and/or from the Template itself, according to the encoder identified in the Template. *See* JA529-531; JA1828-1832. The PMAP is sent with the encoded data and is, itself, stop-bit encoded. JA1812.

### C.    Decoding A FAST Message

To reconstruct data from a FAST-encoded message, decompression hardware and/or software locates the stop bits to reconstruct encoded data and reads the PMAP to determine which fields are present. *See* JA530; JA547. The Template ID is used to locate the corresponding Template. JA545. The Template

---

[13] A field may also be omitted where it is optional. *See* JA1813.

22

dictates whether and which FAST operators were applied to each field, allowing

the system to reverse any FAST operator that the Template states was applied

during encoding.  *See* JA530; JA539; JA547.

## V.    ASSERTED CLAIMS

Three sets of terms in the asserted claims are most relevant for this brief:  (1)

the "descriptor" that "identifies" or "indicates" terms; (2) the "wherein the lossless

encoders are selected based on analyses of content of the data blocks" term; and

(3) the CDDD/CIDD claim terms.  With respect to the issues discussed in this brief

only, claim 108 of the '651 patent and claim 1 of the '747 patent are

representative:

> 108. A system for decoding one or more data packets in a financial data
> stream, wherein multiple decoders applying a plurality of lossless
> decompression techniques are applied to an encoded data packet, the
> system comprising:
>
> an input interface that ***receives an encoded data packet*** from the financial
> data stream ***having one or more descriptors*** comprising one or more
> values, wherein the one or more ***descriptors indicate*** lossless encoders
> used to encode data blocks associated with the data packet, ***and further
> wherein the lossless encoders are selected based on analyses of
> content of the data blocks***;
>
> a memory with a fixed table of data blocks based on a priori knowledge of
> the financial data stream and an adaptive table of data blocks;
>
> a data decoding engine operatively connected to said input interface and said
> memory having a computer readable program code of instructions
> executable by the data decoding engine, said instructions comprising
> instructions to: analyze the encoded data packet to identify a descriptor;

select one or more lossless decoders for a data block associated with the encoded data packet, wherein the selecting is based on the descriptor;

decode the data block with a selected lossless decoder using a data block in said adaptive table identified by said selected lossless decoder, if available, otherwise using a data block in said fixed table identified by said selected lossless decoder; and store the decoded data block in said adaptive table, such that the decoded data block is available to decode one or more other data blocks; and

an output interface operatively connected to said data decoding engine that outputs data from the data packet.

JA524(33:1-33) (emphasis added).

1. A method of decompressing one or more compressed data packets of a data stream using a data decompression processor, wherein multiple decoders applying a plurality of lossless decompression techniques are applied to a data packet, the method comprising:

***receiving a data packet from the data stream having one or more descriptors*** comprising one or more values, wherein the one or more ***descriptors indicate lossless encoders used to compress data blocks*** associated with the data packet, and further ***wherein the lossless encoders are selected based on analyses of content of the data blocks***;

analyzing the data packet to identify a descriptor;

selecting one or more lossless decoders for a data block associated with the data packet, wherein the selecting is based on the descriptor;

decompressing the data block with a selected lossless decoder ***utilizing content dependent data decompression, if the descriptor indicates the data block is encoded utilizing content dependent data compression***; ***and***

decompressing the data block with a selected lossless decoder ***utilizing content independent data decompression, if the descriptor indicates the data block is encoded utilizing content independent data compression***.

24

JA491(26:18-42) (emphasis added).

## VI.    CLAIM CONSTRUCTION AND 35 U.S.C. § 112 BRIEFING

### A.    The Descriptor Identifies Or Indicates Terms

Nearly every claim that Realtime asserts requires a "descriptor" that "indicates" or "identifies" the encoder(s) used to compress the data block.[14] Before the district court, the parties disputed the proper construction of these terms.  Realtime proposed that the word  "descriptor" be construed as a "data token," while defendants proposed that the phrases "descriptor … indicates/identifies" be construed as  "recognizable data that is appended to the encoded data for specifying."  JA60-61.

The district court adopted defendants' proposed construction, but clarified that "append" meant that "the descriptor must be 'with,' in the sense of 'attached to,' the encoded data," and not physically at the end of the data.  JA61.   Noting that the specifications of the Patents-in-Suit use the terms "indicates" and "identifies" interchangeably, the district court also construed those words as "synonyms."  JA63.

---

[14] Claims 15 and 32 of the '568 patent use the term "identifies," while the remaining asserted claims use "indicates."  Claims 20 and 22 of the '568 patent, which do not require descriptors, are asserted only against the Exchange Defendants-Appellees and Morgan Stanley.  Br. 63.

### B.    The Encode-Decode Claim Limitation

During claim construction, there was no dispute as to the meaning of the phrase "wherein the lossless encoders are selected based on analyses of content of the data blocks." The claim limitation that "lossless encoders are selected" refers in the present tense to an active selection of the encoders. JA524(33:10-11). The parties stipulated that this phrase means "the system (or method) selects the lossless encoders based on analyses of content of the data blocks (or data fields)." JA1406. The parties further stipulated that the phrase "analyses of content of [the] data blocks [or fields]" means "directly examining the content of the data to be compressed to determine the data block (*or* data field) type of that data." JA1404. Thus, the agreed-upon construction requires the claimed system or method to directly examine content of the data to be compressed and to select lossless encoders based on that analysis.

That the parties understood the agreed-upon construction to require a single system to perform both decompression and the selection of encoders for compression was confirmed during the *Markman* hearing, where Defendants-Appellees discussed the agreed-upon construction at length:

> Some of the claims, when you read the preamble of the claim, it says a method for decompressing … ***When you look at the language of the claim, there is a compression step in all of these claims. There are no true decompression claims here.***
>
> ***Each of those so-called decompression claims has a compression***

26

*step.* Specifically, every one of these claims says the lossless encoders are selected, encoders are selected, based on analysis of the content of the data fields.

* * *

***This is clearly a compression step. It's in their decompression claims. These are really hybrid claims. The decompression claims they say it's a method for decompressing, but then, when they wrote the claim, they put this compression step in the claim itself. So these claims are hybrid decompression/compression claims.*** In fact, they have actually stipulated to that.

This was an important point to us. We said one of the things we have to do when we were negotiating the Markman terms with them, the claim construction terms, ***we said we need it to be clear that this overall clause, this wherein clause that is in all your decompression claims, we need it to be clear that the system or method is actually selecting the lossless encoders****…. They stipulated to that.

So this is the wherein clause that is in all of these claims. ***There is a stipulated construction that the system or method selects the lossless encoder, which is clearly a compression step.***

JA854-855 (emphasis added).

Realtime later agreed to the submission of a joint letter seeking entry of this stipulated claim construction. JA5334-5342.

### C. The Content Independent And Content Dependent Decompression Claims

Claims 1, 4, 6, 7, and 12 of the '651 Patent and Claims 1, 7, 8, and 13 of the '747 patent contain limitations requiring "decompressing the data block with a selected lossless decoder utilizing content dependent data decompression, if the descriptor indicates the data block is encoded utilizing content dependent data

27

compression," and "decompressing the data block with a selected lossless decoder utilizing content independent data decompression, if the descriptor indicates the data block is encoded utilizing content independent data compression." *E.g.*, JA491. Defendants-Appellees filed an opposed motion for partial summary judgment of invalidity because these limitations, which were first introduced in claims added ten years after the Realtime's original patent application was filed, fail to satisfy the written description and definiteness requirements of 35 U.S.C. § 112. JA330.

## VII. SUMMARY JUDGMENT

The district court granted summary judgment on several bases, four of which are discussed in this brief. First, the district court held that Defendants-Appellees' accused instrumentalities do not utilize a "descriptor" that "indicates" or "identifies."[15] JA184; JA209-212. The court concluded that, because the Template was not "with" or "appended" to the encoded data, it could not be a "descriptor" that "identifies" or "indicates." JA186; JA210. It further concluded that, because the PMAP and Template ID do not themselves or in combination

---

[15] The summary judgment ruling on "descriptor" was case dispositive for all Defendants-Appellees except Morgan Stanley; CME Group Inc.; International Securities Exchange; NYSE MKT, LLC; NYSE Arca, Inc.; NYSE Euronext; and Options Price Reporting Authority.

indicate the encoders used, they are not a "descriptor" that "identifies" or "indicates."  JA185-186; JA209-210.

Second, the district court held that Defendants-Appellees' accused decoding instrumentalities do not infringe claims 95, 97, 108, and 112 of the '651 patent because each of these claims requires that a system "selects the lossless encoders based on analyses of content of the data blocks."[16]  JA196.  Because it was undisputed that Defendants-Appellees' decompression systems do not select lossless encoders, the district court granted summary judgment of non-infringement.  JA196-197; JA162-164.

Third and fourth, the district court held that the terms CIDD and CDDD were indefinite and that the CDDD/CIDD claims failed to meet the written description requirement of 35 U.S.C. § 112.  JA84-85.  The court explained that "[s]imply put, decompression has everything to do with the algorithm used at the front-end compression and nothing to do with the content on which the selection of that algorithm was based."  JA84.  Thus, limitations purporting to require "content dependent data decompression" are "undefined and meaningless."  JA82; JA84-85.

---

[16] This summary judgment ruling was case dispositive for all Bank and Data Provider Defendants-Appellees except Morgan Stanley.

# SUMMARY OF ARGUMENT

The district court correctly determined that Defendants-Appellees' implementations of FAST do not meet the "descriptor … indicates/identifies" limitations as a matter of law. The district court's claim construction of this limitation was correct and well-supported by the intrinsic and extrinsic evidence. There is no genuine dispute as to any material fact, as the parties agreed how the Template, Template ID, and PMAP function in FAST.

The district court's grant of summary judgment of non-infringement of the Encoding-Decoding Claims was also correct. Realtime agreed to the claim construction that the district court applied and cannot now seek a new construction simply because it is unhappy with the ultimate outcome. Moreover, that agreed construction was correct. Realtime's belated suggestion that the phrase at issue cannot require both encoding and decoding is belied by the plain language of the claims, the teachings of the specification, and the claims of previously asserted patents sharing the same specification as the '651 Patent. Because it is undisputed that Defendants-Appellees' accused decompression systems never select encoders, the district court correctly granted summary judgment of non-infringement for those systems.

Finally, the district court correctly concluded that the CDDD/CIDD claims are invalid for failing the written description and definiteness requirements of 35

U.S.C. § 112.  These claims are directed to a system in which decompression is sometimes "content dependent" and is at other times "content independent." Nothing in the specification, however, describes such a system.  In addition, those claims are indefinite because the meanings of the terms "CDDD" and "CIDD" are insolubly ambiguous.

## ARGUMENT

### I.    THE DISTRICT COURT CORRECTLY CONSTRUED THE "DESCRIPTOR … INDICATES/IDENTIFIES" TERMS AND CORRECTLY APPLIED THAT CONSTRUCTION TO UNDISPUTED FACTS

The district court correctly found that the Defendants-Appellees' software implementing FAST does not utilize a "descriptor" that "indicates" or "identifies" encoders as required by the claims.  JA184; JA209-212.  In the patented system, the optimal encoders cannot be predicted in advance; rather, they are selected in real-time as the content of each data block is analyzed.  *See, e.g.*, JA436; JA1404. Accordingly, in order to enable decoding, each data message must include a descriptor identifying the encoder(s) applied, because there is no way that the decompression system can know in advance which combination of encoders will be selected.

In contrast, FAST messages do not include a descriptor identifying the encoder(s) applied because the decompression system already knows which combinations of encoders will be used.  Unlike the patented systems, FAST

devices provide a Template to the decoding system before any compressed data is sent (or, in certain systems, hard-code a Template into the decoder). JA539; JA1845. This Template pre-selects the field operator (if any) that may be used to compress each field of the message. JA1800; JA539-542.

It is undisputed that the "Template ID" and "PMAP," which are the only data transmitted with the encoded message, do not themselves identify any encoder selected for compression. JA5854; JA4304.

### A. The District Court Correctly Interpreted The "Descriptor … Indicates/Identifies" Clauses To Mean "Recognizable Data That Is Appended To The Encoded Data For Specifying"

The district court construed the phrases "descriptor … indicates" and "descriptor … identifies" in the asserted claims to require "[r]ecognizable data that is appended to the encoded data for specifying" the encoder used to compress that data. JA64. As the district court explained, that construction is consistent with the plain meaning of the claims and the patents' specifications, and is therefore the correct construction. JA61-63; *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1315 (Fed. Cir. 2005) (en banc); *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1320 (Fed. Cir. 2013).

On appeal, Realtime asserts three errors in the district court's construction (Br. 24-25), but none of its arguments has merit. ***First***, Realtime claims that the district court's construction is "at odds" with the patents' definition of "data

compression type descriptor" as "'any recognizable data token or descriptor that indicates which data encoding technique has been applied to the data.'"  Br. 23-24 (quoting) JA515(16:23-26); JA482(8:53-56)).  But—because there is no inconsistency—Realtime points to no specific conflict between the district court's claim construction and that definition.  Moreover, the district court did not construe the word "descriptor" in isolation.  It construed the phrases "descriptor … indicates" and "descriptor … identifies."  JA60.  The district court's construction of those phrases is entirely consistent with the patents' specifications.  The construction includes the additional requirements that the descriptor be appended to the encoded data and specify the encoders used.  JA61.  These requirements (rightly) come from the claims' use of the phrases "descriptor … indicates" and "descriptor … identifies," instead of from the use of the word "descriptor" alone.

Indeed, a "descriptor" specifying the encoders and appended to the encoded data block is expressly described in the sentence directly preceding the definition of "data compression type descriptor": "[A] description module, operatively coupled to the compression ratio module, *appends* a corresponding compression type descriptor *to each encoded data block* which is selected for output so as *to indicate the type of compression format of the encoded data block*." JA515(16:19-23) (emphasis added) (citations to diagram omitted); JA482(8:52-53).  Thus, the construction of the phrases "descriptor … indicates" and "descriptor

33

… identifies" is consistent with the specifications, and not "at odds" with the patents' definition of "data compression type descriptor" as Realtime suggests.  Br. 24.

    ***Second***, Realtime now claims, for the first time, that the district court incorrectly "import[ed]" a limitation that the descriptor be "appended to" the data, when the district court expressly stated that "appended to" meant "with."  Br. 25.  But, Realtime *agreed* that a descriptor had to be "with" the encoded data in its arguments before the district court.[17]  JA5732 ("the descriptor exists along with the encoded data somewhere in the encoded data packet."); *see also* JA5741 ("The messages in each of the encoded data packets contain descriptors comprising a PMAP and a template identifier or message category/type that are appended to the encoded data.").  By its agreement, Realtime waived a contrary construction.

    Even absent Realtime's concession, the Court did not improperly "import" a limitation that the descriptor be "appended to" or travel "with" the encoded data.  The asserted claims that include both compression and decompression steps require "analyz[ing] the encoded data packet to identify a descriptor," and that the decompression system "select[s] one or more lossless decoders for a data block associated with the encoded data packet, wherein the selecting is based on the

---

[17] In the district court, Realtime's expert opposed a construction that required the descriptor to be "appended to" the encoded data to the extent that meant "add[ed] to the end thereof."  JA611-13.

descriptor." *E.g.*, JA524(33:20-23); JA491(26:31-34). These operations would be impossible if the encoded data packet itself did not "hav[e] one or more descriptors" that identified the encoders used to compress that data block. *E.g.*, JA524(33:6); JA491(26:24).

Moreover, the specifications of Realtime's patents leave no doubt that a "descriptor" in the alleged invention will be attached to the encoded data block. For example, the "summary of the invention" of the '747 patent (which is incorporated by reference in the '651 patent) twice mentions "appending a corresponding compression type descriptor to the selected encoded data block," and presents this as a primary feature of the alleged invention. JA480(3:6-4:2, 4:18-19). The figures in Realtime's patents also clearly and repeatedly depict the descriptor being attached to a data block. *See* JA448; JA451; JA454; JA458; JA465; JA471; JA477; see also JA459 (showing "descriptor extraction" from a transmitted data block); JA460 (same); JA507 (same); JA462 (depicting a step in encoding of data block called "Append Compression Type Descriptor").

***Third***, Realtime also claims that the district court improperly imported a limitation that the descriptor "specify" the lossless encoders, rather than use the terms "indicate" or "identify." Br. 25. Specify is a synonym of the terms "indicate" and "identify," which (as the Court found and Realtime does not challenge on appeal) are used "interchangeably" in the patents. *See* JA63. As

35

defendants indicated during *Markman* briefing,[18] use of the word "specify" simply clarifies that "indicate" and "identify" mean the same thing with respect to descriptors: the descriptor is the data that tells the recipient which encoders were used.

While Realtime baldly asserts that "the intrinsic evidence [of the patent] provides no basis" for construing "indicate" as "specify" (Br. 25), the specification repeatedly and consistently explains that each descriptor specifies the compression technique used on that particular block (or, in the case of the "null" descriptor, specifies that no encoding was applied to the block). *See, e.g.,* JA482(7:62-67, 8:38-40, 51-53); JA483(10:11-14, 28-32); JA484(11:44-46, 54-56); JA485(14:1-3, 16-18); JA487(17:55-60, 18:49-51, 61-63); JA488(19:48-50, 60-62); JA489(21:34-36, 47-48); JA490(24:26-28, 38-40); JA491(25:33-35, 45-47); JA515(16:18-23, 36-38); JA482(8:58-60) ("the data compression type descriptor identifies the corresponding encoding technique applied to the encoded data block"); JA488(19:1-3, 19:67-20:2) (same); JA489(21:53-55) (same); JA(24:45-47) (same); JA491(25:52-54) (same); JA515 (16:28-30) (same).

That the descriptor will specify the encoders used to encode the data is especially apparent from the specifications' descriptions of the decoding methods that would be used to decode data encoded by Realtime's alleged invention. In all

---

[18] *See* JA5318.

36

these descriptions, the descriptor extracted from the data block specifies the

encoding methods used to encode the data, and no extraneous sources of

information are used. *See, e.g.*, JA459(fig. 11) (showing decompression where an

extracted descriptor specifies which decoder should be selected to decode the data

block); JA507(fig. 6); JA486(15:19-20); JA485(14:49-54); JA516(17:18-23).

Thus, because the specification expressly and only describes descriptors as

recognizable data that is appended to blocks of encoded data and that specifies the

compression method used, the district court's construction was correct. *See, e.g.*,

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed.

Cir. 2011) (interpreting the claim term "body" to mean a one-piece body, because

each figure and description in the specification depicted a one-piece body); *Kinetic

Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010, 1019 (Fed. Cir. 2009)

(interpreting the claim term "wounds" to mean skin wounds because "[a]ll of the

examples described in the specification involve skin wounds …. To construe

"wound" to include fistulae and 'pus pockets' would thus expand the scope of the

claims far beyond anything described in the specification.").

### B. The District Court Correctly Concluded That The Defendants-Appellees Do Not Utilize A "Descriptor" That "Indicates" Or "Identifies"

Based on Realtime's own admissions, the district court correctly determined

that each of the Accused Products did not meet the "descriptor …

indicates/identifies" limitations as a matter of law.   JA117-120, JA143-146.

Realtime's arguments to the contrary are meritless.

### 1.    Realtime cannot identify any material disputed fact

Without specifying a particular disputed fact or piece of evidence, Realtime

contends that "Realtime offered substantial summary judgment evidence—

including an expert declaration, infringement charts, and supporting documents—

creating, at the very least, a genuine factual dispute."  Br. 36.  Thus, Realtime now

invites this Court, much as it invited the district court below, to comb through the

entire record searching for an unspecified material factual dispute.  But such a

request does not satisfy Realtime's burden.  Fed. R. Civ. P. 56(e); *see also Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (the party opposing summary judgment

on an issue for which it bears the burden, must designate "specific facts showing

that there is a genuine issue for trial.").

Moreover, Realtime cannot demonstrate any such dispute, as the parties

agreed on all the material facts concerning the operation of FAST: (1) only the

PMAP and the Template ID travel "with" the encoded data; (2) neither the PMAP

nor the Template ID, alone or in combination with one another, identify which

encoding algorithm or algorithms were applied to the data block; and (3) the

Template is hardcoded into the decompression software or received and stored in

38

advance of compression and does not travel with the encoded data. The parties'

agreement on these facts is irrefutable when viewed side-by-side:

| Defendants' Summary Judgment Motion | Realtime's Positions |
|---|---|
| The PMAP and Template ID or Message Type is included with each compressed message. JA5853-5854. | "The messages in each of the encoded data packets contain descriptors comprising a PMAP and a template identifier or message category/type that are appended to the encoded data." JA5741. |
| The Template ID and PMAP do not specify any encoders without reference to the Template. JA5854 | Q. [W]ithout the template, [the Template ID and PMAP] don't tell you what encoder was used; correct? A. Correct. JA4304 (Shamos deposition, 116:16-18). |
| The Template is never transmitted with the compressed data from encoder to decoder. There is no need to transmit the Template, as the Template is already present at each end. JA5873; JA5882. | "Undisputed for purposes of this motion." JA5899. -- Q. And the template is not transmitted with the data; correct? A. Correct. JA4304 (Shamos deposition, 116:19-21). |

Thus, the parties agree that FAST does not embed any identification of the

encoders with the compressed data block, but only attaches a Template ID that

provides a reference to a Template that identifies one or more encoders and a

PMAP that indicates the presence of data in a field. Consistent with this,

Realtime's expert testified that his position was that a descriptor does not need to

39

itself indicate or identify the encoder, but can instead be a "pointer" to something that will identify the encoder:

> The question is exactly what does the descriptor have to consist of? Does it have to be identifier of the encoder, or was it sufficient for it to be a pointer to something that will identify the encoder? I've taken the position that the pointer is sufficient, because that's what the template ID is in the absence of the entire template.

JA5908.

Realtime's expert *did not* opine that the Template ID and the PMAP themselves identify or indicate which encoders were applied to the encoded data. Thus, as the district court correctly noted, "[t]he facts relating to this descriptor issue are not in dispute; rather, their characterization is." JA118. Accordingly, this issue was appropriately resolved on summary judgment. *General Mills, Inc. v. Hunt-Wesson, Inc.*, 103 F.3d 978, 983 (Fed. Cir. 1997) ("Where the parties do not dispute any relevant facts regarding the accused product … but disagree over possible claim interpretations, the question of literal infringement collapses into claim construction and is amenable to summary judgment").

### 2.    The district court properly applied the claim construction to the undisputed facts

Realtime also raises three arguments why the undisputed facts should not have resulted in summary judgment. Br. 37-39. None provides a basis for reversal of the district court's summary judgment ruling.

40

### a)    *The PMAP neither identifies nor indicates the selected encoders*

Realtime's first argument (never argued to the district court) is that the PMAP alone specifies whether a "content dependent" or "content independent" encoder was used to encode a particular field.[19]  Br. 37.  This argument fails on multiple levels.  ***First***, it directly contradicts Realtime's position before the district court.  There, Realtime stated "[t]he encoder does not 'imbed' ***any identification*** of the [compression algorithm] within the compressed data."  *See* JA5898 (emphasis added); *see also* JA4304(115:11-116:21); JA5907-5908(260:16-261:22).  Realtime cannot recant what it admitted below to manufacture a dispute of material fact on appeal.  *In re Fosamax Prods. Liability Litig.*, 707 F.3d 189, 193-194 (2d Cir. 2013); *Brand Mgmt., Inc. v. Menard, Inc.*, 1998 WL 15241, at *9 (Fed. Cir. 1998)(unpublished).

***Second***, neither part of Realtime's new argument supports its conclusion that the PMAP specifies whether CIDC or CDDC is applied.  The PMAP indicates whether a field is or is not present; it provides no information about which, if any, field operator was used.  A field that is present may or may not be field encoded, and a field that is not present may be encoded or it may have been optional.  *See, e.g.*, JA5940; JA4304(115:11-116:21); JA5907-5908(260:16-261:22).  Likewise,

---

[19] In the district court, Realtime's position was that the combination of the Template, PMAP, and Template ID constituted the "descriptor."  *See* Br. 36-37.

the PMAP does not tell the decoder that transfer encoding was used.  Transfer

(stop-bit) encoding is ***always*** applied.  In fact, the PMAP itself is stop-bit encoded.

JA1812.

    ***Third***, even if one were to accept Realtime's premise—that the PMAP's

indication of the presence or absence of a given field informs the decompression

software whether CDDC or CIDC was applied—that does not satisfy the

"descriptor" limitation.  The claims require that the descriptor identify or indicate

selected "encoders."  CDDC and CIDC are not encoders.  As the district court

found, they are processes through which encoders are selected.  *See* JA71, JA79-

81.  Thus, even if taken as true, Realtime's position that the PMAP is a

"descriptor" fails because the PMAP never indicates "one or more selected lossless

encoders" as required by the claims.

       ***b)***    ***The Template ID (alone or in combination with the PMAP) neither identifies nor indicates the selected encoders***

    Realtime next suggests that the Template ID—either alone or in combination

with the PMAP—is a "descriptor."  Br. 37.  Realtime asserts that the Template ID

"specifies" the correct Template.  *Id.*  However, as Realtime's argument itself

reveals, it is undisputed that the Template ID—even when present—does not

specify ***encoders***.  JA5854; JA4304.  The Template ID's sole purpose is to identify

the previously stored Template, which is used to determine which FAST field

operator (*e.g.*, Copy, Delta, etc.) may be applied to each field.  JA539-542;

JA1803.[20]   The Template ID is simply a number.  JA545.  It contains no

information about whether the data is encoded, much less the encoder(s) used.

Combining the PMAP and the Template ID brings Realtime no closer to the

"descriptor" that "indicates" or "identifies" encoders required by the claims.  Br.

36-37.  Taken together, the PMAP and Template ID communicate nothing more

than (1) which fields of the message are present and (2) what the Template for that

type of message is.  They do not specify which encoders are applied to the

message.  That information is solely located in the Template, which pre-sets the

encoders to be used for each field prior to any messages being encoded or

transmitted.  Realtime does not disagree.  *See* JA4304.[21]

### c) The patents' specifications are wholly consistent with the district court's summary judgment ruling

As detailed above, the Patents-in-Suit only describe a "descriptor" which

itself specifies the encoders used to compress the data.  However, Realtime now

---

[20] The information contained in the Template is necessary but not sufficient to perform decoding.  In many cases, the content of the prior message is necessary to decode a field.

[21] Realtime's argument that "[t]ogether, the appended PMAP and Template ID thus specify that . . . the data in a given field was encoded with the associated encoder listed for that field in the linked template" (Br. 38) concedes that neither the PMAP nor the Template ID sets forth any identification of the encoders, and that only the Template does so.  Realtime's suggestion that the Template ID is "linked" to the Template is incorrect if Realtime means to suggest anything more than that the Template ID is a number that corresponds to a particular Template.

asserts (having never done so before the district court) that the patents disclose an embodiment with a descriptor akin to the Template ID in FAST.  Br. 38-39. Contrary to Realtime's suggestion, the patents do not disclose the use of a Template ID and Template-like technology.

None of the three[22] portions of the '651 patent specification Realtime cites (Br. 38) even relates to the "descriptor," much less discloses a "descriptor" that indicates or identifies a Template-like encoding file.   Instead, these passages each describe how a *single* encoder (*e.g.*, an Arithmetic or Huffman encoder) can be optimized if there is prior knowledge about anticipated characteristics of the data it will compress.  *See, e.g.*, JA512(9:17-21) (cited at Br. 38) ("In preferred embodiments, compression is achieved using Huffman or Arithmetic encoding, wherein one or more state machines **27-27$n$** are constructed based on a-priori knowledge of the structure and content of one or more given broadcast and data feeds.").  The word "descriptor" does not appear anywhere near the passages on which Realtime relies, nor is a descriptor anywhere described in those passages. There is thus no support for Realtime's argument that the patents contemplate the

---

[22] Realtime's citation to JA518(22:28-32) appears to be a mistake.

use of anything akin to the Template ID and Template in the FAST protocol, nor that such a thing exists in any asserted claim.[23]

As it must, Realtime attempts to blur the distinction between the claimed "descriptor" that "indicates/identifies" the encoders and what is employed in FAST. However, that distinction is clear. In Realtime's invention – where an unlimited number of different combinations of encoders may be used to encode data messages whose content is not known prior to encoding – the claimed "descriptor" is needed to specify the results of a dynamic and flexible selection of encoders for a given data block so that an otherwise unknown encoder or combination of encoders is identified to the decoder. Because, in market data feeds, the universe of possible messages is fixed before any data is ever encoded, FAST is a system based upon a fixed and inflexible application of predetermined

---

[23] Likewise, Realtime's reference to the use of a "computer file" (Br. 38) in the patents is unavailing. There is no reference to a "computer file" in the written description of the Patents-in-Suit. In claims that include a "computer file" limitation (such as claims 14 and 19 of the '747 patent), the computer file is utilized **only by the encoder** in order to associate **data types** with optimal encoders. *See, e.g.*, JA492(27:52-55). For example, the computer file might indicate that if the data is text data, a Huffman encoder should be used. But even in those embodiments, the descriptor itself (not the computer file) "indicates the … selected lossless encoders" for the data block. JA492(28:6-9). There is no suggestion in the Patents-in-Suit of a computer file that is stored by the decompression system and identified by the descriptor. Nor is there any suggestion in the Patents-in-Suit of a computer file that pre-selects encoders for particular **data blocks** or **fields** within a message.

encoders for each field, the identity of which is already known to the decoder.  No descriptor that "indicates/identifies" the encoders is needed in such a system.

## C.    Realtime Put Forth No Relevant Doctrine Of Equivalents Evidence On Descriptor … Indicates/Identifies

Separately from its challenge to the district court's summary judgment on the "descriptor … indicates/identifies" limitation, Realtime alleges error in the district court's discretionary decision to preclude Realtime from asserting infringement under the doctrine of equivalents.  Br. 59-62.  That determination (which was correct) is separately addressed in CME Br. at § V.C.2.  Even if the Court were to find error with the district court's determination on this issue, however, that would have no impact on its decision to grant summary judgment based on the "descriptor" limitation.

Realtime's expert never offered an opinion that the "descriptor … indicates/identifies" limitation was satisfied by the PMAP and/or Template ID using the doctrine of equivalents under the claim construction adopted by the district court.  Instead, the only doctrine of equivalents opinion Realtime's expert offered on "descriptor" was unrelated to the district court's summary judgment decision.  Realtime's expert opined that if "'appended' means 'concatenated at the end of,' then the Accused Products would still meet the ['appended' portion of the descriptor limitation] under the Doctrine of Equivalents."  JA5763.  The district court expressly rejected this definition of "appended."  *See* JA62-63.  Realtime

46

offered no evidence of equivalence on the issues that led to summary judgment on the "descriptor … indicates/identifies" limitation.

## II. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE ENCODING-DECODING CLAIMS

As discussed above, all asserted claims that include decompression or decoding limitations contain the requirement "wherein the lossless encoders are selected based on analyses of the content of the data blocks." *See, e.g.*, JA523(31:36-37). The parties stipulated to a construction of the entire clause as "the system (or method) selects the lossless encoders based on analyses of content of the data blocks (or data fields)." JA1406; JA6024. Because there is only one "system (or method)" referenced in each asserted claim, the agreed-upon construction makes clear that, to infringe, the accused system or method must examine the content of the data to be compressed to determine a data type and select lossless encoders based on that determination. JA1406. It is undisputed that none of the Defendants-Appellees' accused decompression systems does so. *See* Br. 51-52; JA6025, JA6027-6028, JA6029-6031; JA6042-6044. The district court thus correctly granted summary judgment on the basis of this stipulated construction. JA196-197, JA162-164.

Realtime belatedly argues that the construction to which it stipulated does not require the system or method to select lossless encoders to infringe. Br. 49-52. In making this argument, Realtime runs from the plain language of the agreed-

47

upon construction and instead seeks a new "clarifying" claim construction that it never proposed in the district court. As explained below, it is too late for Realtime to object to or try to change the agreed construction on appeal. Moreover, the agreed-upon construction tracks the claim language and is consistent with a disclosed embodiment in the specification.

### A.    Realtime Cannot Challenge A Stipulated Construction On Appeal

Realtime's requests that this Court either disregard the stipulated claim construction or issue a new "clarifying" construction (Br. 52) are without merit. A "party may not introduce new claim construction arguments on appeal or alter the scope of the claim construction positions it took below." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1358-1359 (Fed. Cir. 2006).

This rule has particular force here, where Realtime ***agreed*** to the district court's construction. JA854-855; JA5334-5342. This Court reviewed similar facts in *Digital-Vending Servs. Int'l, LLC v. University of Phoenix, Inc.* 672 F.3d 1270 (Fed. Cir. 2012). There, the parties stipulated to a construction of "registered user," which the defendant noted on two occasions would require a "registration server." *Id*. at 1277-1278. After the district court entered the parties' stipulated construction and the defendant moved for summary judgment of non-infringement due to the lack of a registration server, the plaintiff moved for "clarification" of the agreed-upon construction. *Id*. at 1278. The district court denied the motion for

48

clarification, and granted summary judgment of non-infringement. *Id.* This Court affirmed, holding that "[b]y stipulating to the construction that the district court adopted, Digital-Vending waived its right to challenge this construction on appeal." *Id.*

Like the appellant in *Digital-Vending*, Realtime has waived any right it had to challenge the agreed construction. *See also Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1367 (Fed. Cir. 2005) (holding that a party who failed to challenge a construction during *Markman* waived any right to challenge to the district court's interpretation of that term on appeal); *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 889 (Fed. Cir. 2004) (finding waiver where plaintiff agreed to a construction before the district court but tried to alter the construction on appeal); *Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1353 (Fed. Cir. 2003) (holding that a patent owner "cannot seek to modify an agreed claim construction on appeal").

Recognizing its waiver, Realtime now seeks to characterize the instant dispute as the result of an "unintended latent ambiguity" in the parties' stipulated construction. Br. 52. But the Encoding-Decoding claims were discussed at length during the *Markman* hearing where the Defendants-Appellees repeatedly explained that the claims and agreed-upon construction required the selection of encoders, stating, for example:

49

- "[e]ach of those so-called decompression claims has a compression step;"

- "[t]here is a stipulated construction that the system or method selects the lossless encoder, which is clearly a compression step;" and

- "[t]he decompression claims … say it's a method for decompressing, but then, when they wrote the claim, they put this compression step in the claim itself.  So these claims are hybrid decompression/compression claims."

JA854-855.  At no time did Realtime disagree with these statements or seek to modify the agreed-upon construction presented to the district court.  In fact, Realtime confirmed during the *Markman* hearing that "every one of the claims that we are asserting in this case requires an analysis of the content of the data block." JA809.

After both the *Markman* hearing and the Court's *Markman* decision on disputed claim terms, Realtime agreed to the submission of a joint letter seeking entry of the stipulated claim constructions.  JA5334-5342.  The fact that Realtime was aware that the stipulated construction required encoding, at least as of the *Markman* hearing, makes any attempt at a "re-do" particularly inappropriate.  *See Digital Vending*, 672 F.3d at 1277-1278;  *LizardTech, Inc. v. Earth Res. Mapping Inc*., 424 F.3d 1336, 1341 (Fed. Cir. 2005) ("[Plaintiff] agreed to the …

50

construction at the time, and it cannot now argue against that claim construction simply because it resulted in an adverse ruling on summary judgment.").  Such a belated attempt to revise the outcome of a stipulated claim construction on appeal runs contrary to the spirit of the *Markman* process as a means to streamline and focus patent litigation.[24]

## B.    The Agreed-Upon Construction Is Supported By The Claims And Specification

Even if this Court were to permit Realtime to raise and argue a new claim construction issue on appeal, Realtime's argument—and its "clarifying" construction—are wrong.  The plain language of the Encoding-Decoding claims requires that, to infringe, the system or method must select lossless encoders and the written description supports the agreed-upon construction.

### 1.    The plain meaning of the claim language requires encoding and decoding by a single system/method

Realtime asserts that the inclusion of an encoding limitation "makes little sense in the context of the claim language," because the other limitations of the

---

[24] The decisions Realtime points to as alleged support for its proposed "clarifying" construction (Br. 52-53) do not involve agreed-upon constructions, and are thus inapposite.  *See Decisioning.com Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1313 (Fed. Cir. 2008) (involving a disputed claim term which had been altered by the district court during summary judgment); *see also Meyer Intellectual Props. Ltd. v. Bodum Inc.*, 690 F.3d 1354, 1368-69 (Fed. Cir. 2012) (involving a term that had not been construed by the parties or the district court).

claims are directed to decompression.[25]  Br. 49.  Realtime might very well wish it

had patented a decompression-only system.  But the plain language of the claims

requires that "lossless encoders *are selected* based on analyses of content of the

data blocks."  JA523(31:36-37); JA523(32:14-15) (emphasis added).  The claims

do not recite that encoders "have been selected" or "were selected;" rather, the

claim refers in the present tense to a property of the claimed system or method

itself.[26]  While Realtime contends that the claims refer to two separate systems or

methods, i.e., one for encoding and a separate one for decoding, (Br. 49-50) only

one system (or method) is described in each asserted claim.

　　　As Realtime acknowledges (Br. 28-29), "claims may not be construed with

'the objective of capturing or excluding the accused device.'" (*Id*. (citing *Vita-Mix

Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1324 (Fed. Cir. 2009)).  Where, as

here, the patentee structured the claims at issue to require *both* encoding and

---

[25] Realtime also faults the district court for ignoring its expert's declaration stating
his belief that the Encoding-Decoding Claims do not contain an encoding step.  Br.
52.  Realtime submitted this declaration in connection with its opposition to a
summary judgment motion, well after *Markman* was complete.  In any event,
extrinsic evidence by an expert cannot be used to modify the express language of
the claims.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (en
banc) (expert testimony "that is clearly at odds with the claim construction
mandated by the claims themselves" should be discounted).

[26] While Realtime now argues that these claims are written to "capture
infringement by a single party" (Br. 50), there is no doubt (and it is not disputed)
that a single party could perform both the requisite encoding and decoding
functions of the claims.  The issue here is simply that the Defendants-Appellees'
accused instrumentalities do not do so.

decoding steps—and stipulated to a claim construction that explicitly requires

*both*—this Court should not "unilaterally restructure the claim … to remedy these

ill-conceived claims." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381

(Fed. Cir. 2007), *overruled on other grounds by Akamai Techs., Inc. v. Limelight*

*Networks, Inc.*, 692 F.3d 1301 (Fed. Cir. 2012).

Finally, despite Realtime's suggestion (Br. 50-51), the preamble's reference

to a "decoding" system or method cannot vitiate the express encoding limitation of

the claim.  A preamble that merely states the purpose or intended use of an

invention is not limiting.  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d

1298, 1305 (Fed. Cir. 1999); *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823

(Fed. Cir. 2003).  As the reference to "decoding" merely describes an intended

purpose or end-point of the claimed invention—that data is ultimately decoded—

such reference cannot broaden the claim by eliminating the encoding limitation.

To the contrary, claim terms are to be interpreted "with an eye toward giving effect

to all terms in the claim."  *Bicon, Inc. v. Straumann Co*., 441 F.3d 945, 950 (Fed.

Cir. 2006).  Unlike Realtime's new argument and "clarifying" construction, the

stipulated construction does so.

### 2.    The specification supports claims directed to an encoding-decoding system or method

Realtime's suggestion that the inclusion of an encoding step in the

Encoding-Decoding Claims "excludes a preferred embodiment" (Br. 18; *see also*

*id*. at 48, 52) mischaracterizes the specification.  The specification of the '651 patent describes an embodiment of the claimed invention (shown in Figure 2) which includes ***both*** encoding and decoding: "Advantageously, a ***compression/decompression scheme according to the present invention*** using Huffman or Arithmetic encoding provides secure transmission."  JA512(9:56-58) (emphasis added); JA503(fig. 2); JA512(9:4-6)

In addition, Realtime's '568 and '274 patents, which share the same written description with the '651 patent, also have claims that perform both encoding and decoding.  *See, e.g.*, JA431(26:63-27:8); JA6398(23:35-47) (reciting steps of "selecting an encoder," "compressing the data," "broadcasting the compressed data," and "utilizing a decompression state machine … to decompress the compressed data").  That Realtime obtained such claims demonstrates—contrary to its current litigation position—that Realtime believed the written description supports claims requiring both encoding and decoding.  Realtime cannot convincingly assert now that the same written description lacks support for claims directed to such systems.

### 3.    Realtime's reliance on *Uniloc* and *SiRF* is misplaced

Finally, Realtime's attempt (Br. 50-51) to analogize its Encoding-Decoding claims to the claims at issue in in *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) and *SiRF Technology, Inc. v. ITC*, 601 F.3d 1319 (Fed. Cir.

2010), fails, because Realtime's Encoding-Decoding claims are readily distinguishable.

The claim at issue in *Uniloc* was directed to "[a] remote registration *station*" which was "part of a registration *system* … including local licensee unique ID generating means …" *Uniloc*, 632 F.3d at 1309 (emphasis added). The claim thus explicitly stated that the invention—the registration station—formed a part of an overall system, and that this system, rather than the claimed station, generated the local licensee ID. As a result, the Court deemed generation of a local ID to be part of the "environment in which the [claimed station] functions" and not a claim limitation itself. *Id.*

Unlike the claim in *Uniloc*, nothing in the claim language of the asserted Encoding-Decoding Claims describes the encoding functions as "part" of a system which takes place outside the claimed invention. To the contrary, Realtime *agreed* to a construction of the claim phrase at issue which makes explicit that the encoding functionality must be performed by the claimed system (or method), and not by a system outside the scope of the claim.

*SiRF* involved GPS technology, with claims directed to an invention that received, processed, and transmitted certain satellite information. The Court refused to read in additional steps of "enabling" or "activating" a GPS device which were not recited in the claims and which could only be performed by third-

55

party end users.  *SiRF*, 601 F.3d at 1329-1330 nn.7-8.  Unlike in *SiRF*, the

encoding step at issue here is in the claim and in the agreed-upon construction.  It

is thus Realtime who is asking the Court to modify the explicit claim language to

advance its case, not Defendants-Appellees.

### C.  Realtime Cannot Prove Infringement Of The Encoding Limitation Of The Encoding-Decoding Claims Literally Or Under The Doctrine Of Equivalents

Realtime concedes that the accused decompression software does not encode

data and does not select lossless encoders.  JA6025; JA6027-6028; JA6029-6031;

JA6042-6044.  Further, Realtime does not even attempt to argue—nor could it

have argued—that the Defendants-Appellees who operate decompression software

direct, control, or have an agency relationship over the separate entities who

perform encoding.  JA6027, JA6028, JA6030-6031; *see BMC*, 498 F.3d at 1380-

1381 (defendant must be the "mastermind" such that the law would hold defendant

vicariously liable for each step); *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d

1318, 1329 (Fed. Cir. 2008) (defendant must exert control or direction over entire

process); *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279,

1286-88 (Fed. Cir. 2011) (principles of "vicarious liability" and "control" likewise

apply to system claims).[27]

---

[27] Far from asserting such an agency or control relationship, Realtime took issue
with the district court's suggestion that Realtime had previously argued that the
Defendants-Appellees "mastermind[ed]" the original encoding, noting instead that

Finally, Realtime has never argued that the accused decompression software meets the receiving clause of the Encoding-Decoding Claims under the doctrine of equivalents.  *See* JA1759-1760.  Thus, the finding of summary judgment of non-infringement of the Encoding-Decoding Claims should be affirmed.

### III.  THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT OF INVALIDITY AS TO CLAIMS 1, 4, 6, 7, AND 12 OF THE '651 PATENT AND CLAIMS 1, 7, 8, AND 13 OF THE '747 PATENT

As the district court correctly found, Realtime's CDDD/CIDD claims lack written description and are indefinite.  JA84-85.  The CDDD/CIDD claims are directed to a system in which one of two different decompression techniques is applied, depending on the content of the descriptor:

> decompressing the data block … utilizing content dependent data decompression, *if* the descriptor indicates the data block is encoded utilizing content dependent data compression; and

> decompressing the data block … utilizing content independent data decompression, *if* the descriptor indicates the data block is encoded utilizing content independent data compression.

JA491 (emphasis added).

As the written description does not teach this decompression technique, the claims do not comply with the written description requirement of 35 U.S.C. § 112.  In addition, those claims are invalid as indefinite under § 112 because "CDDD" and "CIDD" cannot be differentiated and are thus insolubly ambiguous.

---

this "mastermind" argument applied only to "different claims from a different patent." Br. 52 n.18.

## A. The District Court Correctly Invalidated The Claims For Failing The Written Description Requirement

The CDDD/CIDD limitations were first introduced in claims added ten years after Realtime's patent applications were first filed. JA6055-6073 (adding claims 48-69 which would later issue as claims 1-22 of the '747 patent); JA6074-6107 (adding claims 29-151 which would later issue as claims 1-123 of the '651 patent). Those limitations contain at least two requirements: (1) a descriptor that indicates whether the data was encoded using content independent or content dependent data compression, and (2) a decoder that chooses a decompression technique based on whether the data was encoded using content independent or content dependent data compression. *See, e.g.*, JA491(26:31-42). The specification does not describe either requirement.

The entirety of the specification's disclosure regarding decompression is located in a single column of text and three figures. *See* JA485-486(14:39-15:49); JA446(Fig. 2); JA459(fig. 11); JA460(fig. 12). Figures 11 & 12 are identified as "a content independent data decompression system"[28] JA481(5:45-50).

---

[28] The specification contains no disclosure of a "content dependent data decompression system."



FIG. 12

JA460.

The specification explains that, to compress data, a descriptor is received and stored as part of the data block (steps **1200** and **1202**). JA486(15:13-17). The descriptor is extracted (step **1204**) and checked to see whether it is "null" (step

**1206**) JA486(15:19-22). If null, the data block has not been encoded at all and does not need to be decoded; the data is simply output (step **1208**). JA486(15:22-26). If the descriptor is not null (i.e., if the data block is encoded), then the decompression system "select[s] decoder(s) corresponding to descriptor" (step **1210**), and decodes the data (step **1212**). JA486(15:27-40). Whether the descriptor is "null" or "not null" is the only determination (other than selecting specific decoders) made based on the descriptor. JA486(15:23-40).

The patent fails to disclose a decompression system or technique in which one type of data decompression, CDDD, is performed if a descriptor indicates that the data was encoded using CDDC, and another type of data decompression, CIDD, is performed if a descriptor indicates that the data was encoded using CIDC.[29] Further, there is no disclosure of a "descriptor" that reveals whether the data block has been encoded using "content dependent" or "content independent" data compression. The district court therefore correctly granted summary judgment on the basis of lack of written description. *Ariad Pharm., Inc. v. Eli Lilly*

---

[29] Realtime admits that conventional decompression methods do not employ the allegedly novel CDDD/CIDD techniques claimed in the patents. JA6117-18 ("[c]onventional decompression methods" are not operable using the claimed invention); JA6117-18 ("data streams compressed using Realtime's novel . . . [CIDC] and . . . [CDDC] techniques cannot be decompressed using conventional decompression methods.").

*& Co.*, 598 F.3d 1336, 1353-1354 (Fed. Cir. 2010) (en banc); *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008).

Realtime's assertions of error in the district court's analysis are without merit.  First, Realtime attempts to conflate the indefiniteness and written description issues and argues that, if the claims are not indefinite, then they are necessarily adequately described.  Br. 56-57.  This is incorrect.  Even if CDDD and CIDD were understandable to a person of skill in the art, the claim limitations of which they are a part are not described in the specification, and as such the claims are invalid as lacking written description.  *See Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 692 (Fed. Cir. 2001) ("Even if the written description does not enable the claims, the claim language itself may still be definite.").

Second, Realtime points to the word "class" in the sentence "[i]t is to be understood that the data compression type descriptor may mandate the application of: a single specific decoder, an ordered sequence of specific decoders, a random order of specific decoders, a ***class*** or family of decoders, a mandatory or optional application of parallel decoders, or any combination or permutation thereof" (JA486(15:27-37) (emphasis added)) to argue that "content dependent" and "content independent" are two different "classes" of decoders.  Br. 58.  This argument – which Realtime never raised before the district court – is unsupported. The patent never describes "content dependent" or "content independent" data

61

compression (or data decompression) as "class[es]" of encoders or decoders.  A "class" of encoders typically refers to a group of encoders that share a common characteristic.[30]  But contrary to describing different "classes" of encoders, the patents expressly state that "content independent" and "content dependent" encoders can consist of identical encoders.  JA486(16:27-34, 42-47).  The patents describe CDDC and CIDC as two different encoder-selection techniques, each of which can use the same "classes" of encoders.  *See* JA486(16:27-34; 16:43-47).  Thus, the patents' use of the word "class" does not supply the written description Realtime's patents lack.

Third, in the only other portion of the specification to which Realtime points as alleged written description support (JA485(14:54-59)), Realtime uses ellipses to exclude the part of the sentence that contradicts its position.  Br. 58.  In full, this sentence reads "[t]he data compression type descriptor may possess values corresponding to null (no encoding applied), a single applied encoding technique, or multiple encoding techniques applied in a specific or random order (in accordance with the data compression system embodiments and methods discussed above)."  JA485(14:54-59).  It confirms that the descriptor solely identifies (1) whether any encoder was used, and (2) if so, which encoders were used.  The

---

[30] *See, e.g.*, David Solomon, Data Compression: The Complete Reference 133, 755 (3d ed. 2004) ("Previous chapters discuss the main classes of compression methods: RLE, statistical methods, and dictionary-based methods.").

passage says nothing about a descriptor that indicates whether CDDC or CIDC was applied in order to select which encoders to use.

Finally, Realtime asserts error in the district court's reference to the testimony of a prosecuting attorney and argues that the court failed to apply proper weight to Realtime's expert's testimony that the claims do not lack written description. Br. 58-59. However, the district court correctly recognized the prosecuting attorney's fact testimony was helpful where he acknowledged that the specification of the Patents-In-Suit did not contain any discussion of using content dependent or independent decompression. JA83. That was not error.

Likewise, because Realtime's expert did not tie his conclusory written description opinions to any evidence or to a specific disclosure in the patents, they carry no weight. *Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 876 (Fed. Cir. 1998) (conclusory opinions of an expert are insufficient to overcome summary judgment). Thus, there was no error in the district court's decision to grant summary judgment notwithstanding the conclusory legal opinion offered by Realtime's expert.

As the district court correctly noted, there was no disagreement between the experts on the underlying ***facts*** (as opposed to the ultimate legal issue of whether there was adequate written description). JA86. Realtime agreed with all relevant

63

statements of fact during summary judgment, and it fails to point to a single disputed fact as a basis for precluding summary judgment on this basis.

### B.    The Terms "Content Dependent Data Decompression" And "Content Independent Data Decompression" Are Indefinite.

The district court also correctly held that "CIDD" and "CDDD" are indefinite because these terms are insolubly ambiguous.  JA85.  Under Realtime's "construction" both terms refer to an identical process, and there is no aspect of the data decompression that distinguishes "content dependent" from "content independent" data decompression.  Even on appeal, Realtime points only to the unsupported and tautological opinion of its expert that CDDD and CIDD "are understood by persons in the art as describing the methods to reverse CDDC and CIDC."  Br. 54.  The parties' experts, however, *agreed* that CDDD and CIDD have no ordinary meaning to persons of skill in the art.  JA79.  Thus, to say that a decompression technique "reverses" the technique used to select which encoders were used to compress the data (as opposed to reversing the encoding algorithms themselves) simply begs the question of what it means to "reverse" that selection process.  There is no guidance in the patent and, even now, Realtime cannot explain how "reversing" CDDC is different from "reversing" CIDC.  Thus, there is irresolvable ambiguity regarding whether any particular decompression activity is CDDD or CIDD.

Realtime similarly asserts that, because the district court construed the terms content independent/dependent data ***compression***, the terms content independent/dependent data ***<u>decompression</u>*** cannot possibly be indefinite.  Br. 54. This argument is illogical.  CIDC and CDDC refer to techniques used to select the encoder(s) to apply in order to encode a block of data.  JA64; *supra* pp.9-10.  The patent teaches that CIDC and CDDC can use identical encoders (such as Huffman, Liv-Zempel, etc.) to do so.  JA480(3:3-7); JA485(14:63-67).  The experts agree that, once the data block is encoded, the process used to select the encoding algorithm(s) is irrelevant, because decoding will always simply be reversal of the compression algorithm(s).  JA6162; JA5078.  To decode that encoded data block, the decoder(s) corresponding to the selected encoder(s) are applied.  Thus, decompression is never "content dependent" or "content independent."  Unlike their corresponding compression terms, CIDD and CDDD have no meaning.

Next, Realtime argues that the claim language supports its position because the "straightforward understanding of the CDDD and CIDD terms is supported by the claims themselves."  Br. 55.  But the claims simply state that CDDD should be utilized if the descriptor indicates that CDDC was used to encode the data block, and CIDD should be utilized if CIDC was used to encode the data block. JA480(3:53-56, 4:46-47, 4:53-54); *see also id.*(28:36-44).  The claims do nothing to explain what CDDD or CIDD are.

65

Finally, Realtime points to Defendants-Appellees' statements during a reexamination proceeding regarding anticipatory prior art as proof that the claims are decipherable. Br. 55-56. This argument fails. These anticipation arguments were made based on Realtime's infringement contentions and expected claim construction positions, and not a concession that the claims meet the requirements of 35 U.S.C. § 112. A party is permitted to make arguments in the alternative. *See In re Baycol Prods. Litig.*, 596 F.3d 884, 890 n.6 (8th Cir. 2010) (noting that party's alternative argument was not a concession); *Elliott v. Barker*, 481 F.2d 1337, 1341 (C.C.P.A. 1973).

In short, while Realtime repeatedly insists that CDDD and CIDC "signify the reverse of CDDC and CIDC" (Br. 56), CDDD and CIDD remain insolubly ambiguous because it is entirely unclear what it means to "reverse" an encoder selection process like CDDC or CIDC. As the district court correctly found, whether data was encoded using CDDC or CIDC becomes irrelevant as soon as the data block is encoded. JA77. Stating that a particular decompression "reverses" CDDC or CIDC simply does not give the terms CDDD and CIDD any ascertainable meaning or distinguish them from one another. The district court was therefore correct to hold that CDDD and CIDD are indefinite.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's grant of summary judgment of i) non-infringement of the "descriptor … indicates/identifies" limitations of the asserted claims; ii) non-infringement of the Encoding-Decoding claims by the Decoding Defendants-Appellees; and iii) invalidity of the CDDD/CIDD claims.

May 20, 2013                    Respectfully submitted,


                                */s/  Gregory H. Lantier*
                                William F. Lee
                                Mark G. Matuschak
                                Monica Grewal
                                Kevin S. Prussia
                                WILMER CUTLER PICKERING
                                    HALE AND DORR LLP
                                60 State Street
                                Boston, MA  02109
                                (617) 526-6000


                                Gregory H. Lantier
                                WILMER CUTLER PICKERING
                                    HALE AND DORR LLP
                                1875 Pennsylvania Avenue NW
                                Washington, DC  20006
                                (202) 663-6000

                                *Counsel for Defendants-Appellees*
                                *Credit Suisse Holdings (USA), Inc. and*
                                *Credit Suisse Securities (USA) LLC*

                                */s/ Daniel A. DeVito*
                                Daniel A. DeVito
                                daniel.devito@skadden.com
                                Douglas R. Nemec
                                douglas.nemec@skadden.com
                                Stacey L. Cohen
                                stacey.cohen@skadden.com
                                SKADDEN, ARPS, SLATE, MEAGHER &
                                FLOM LLP
                                Four Times Square
                                New York, NY 10036
                                (212) 735-3000

James J. Elacqua
james.elacqua@skadden.com
Gareth DeWalt
gareth.dewalt@skadden.com
Michael D. Saunders
michael.saunders@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue, Suite 1100
Palo Alto, CA 94301
(650) 470-4500

*Attorneys for Defendants-Appellees*
*Morgan Stanley, The Goldman Sachs*
*Group, Inc., J.P. Morgan Chase & Co.,*
*Morgan Stanley & Co., Inc., Goldman,*
*Sachs & Co., Goldman Sachs*
*Execution & Clearing, LP, J.P. Morgan*
*Securities, Inc., and J.P. Morgan*
*Clearing Corp.*


*/s/ Roy W. Hardin*
Roy W. Hardin
rhardin@lockelord.com
M. Scott Fuller
sfuller@lockelord.com
LOCKE LORD LLP
2200 Ross Avenue
Suite 2200
Dallas, Texas 75201
(214) 740-8601

*Attorneys for Defendants-Appellees*
*HSBC Bank USA, N.A. and*
*HSBC Securities (USA) Inc.*


*/s/ John M. DiMatteo*

John M. DiMatteo
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019
Tel: (212) 728-8299
jdimatteo@willkie.com

*Attorney for Defendant-Appellee*
*Bloomberg L.P.*


*/s/ Constance S. Huttner*
Constance S. Huttner
Stephanie L. Donahue
VINSON & ELKINS LLP
666 Fifth Avenue, 26th Floor
New York, NY  10103
Tel:  (212) 237-0000
Fax: (212) 237-0100

David J. Tobin
VINSON & ELKINS LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Tel: (214) 220-7700
Fax: (214) 220-7716

Syed K. Fareed
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, Texas 78746-7568
Tel: (512) 542-8400
Fax: (512) 236-3278

*Attorneys for Defendant-Appellee*
*Thomson Reuters Corp.*


*/s/  Brian E. Moran*
Brian E. Moran

Robinson & Cole LLP
1055 Washington Boulevard
Stamford, CT 06901-2249
Tel: (203) 462-7512
Fax: (203) 462-7599
Email: bmoran@rc.com

*Attorneys for Defendant-Appellee*
*FactSet Research Systems Inc.*


*/s/ Benjamin W. Hattenbach*
Benjamin W. Hattenbach
Arka D. Chatterjee
Irell & Manella LLP
1800 Avenue of the Stars, Ste. 900
Los Angeles, CA 90067-4276
Tel: (310) 277-1010
Fax: (310) 203-7199

*Attorneys for Defendant-Appellee*
*Interactive Data Corporation.*

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing document for Defendants-Appellees Credit Suisse Holdings (USA), Inc. and Credit Suisse Securities (USA) LLC with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system and served a copy on counsel of record, this 20th day of May, 2013, by the CM/ECF system and by electronic mail to the parties on service list below who have consented to service under Fed. R. App. P. 27(c)(1)(D), and by US mail by those parties that have not so consented to electronic service.

Dated:  May 20, 2013                    */s/ Kevin Prussia*
                                         Kevin Prussia

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I, Kevin Prussia, certify that the foregoing brief complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B). Specifically, this brief contains 13,545 words (excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)) as determined by the word count feature of the word processing program used to create this brief. I further certify that the foregoing brief complies with the typeface requirements set forth in Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). Specifically, this brief has been prepared using a proportionally spaced typeface using Microsoft 2010, in 14-point Times New Roman font.

Dated:  May 20, 2013            */s/ Kevin Prussia*
                               Kevin Prussia